2003 ME 12

**COMPETITIVE ENERGY SERVICES
LLC et al.**

v.

**PUBLIC UTILITIES COMMISSION
et al.**

Supreme Judicial Court of Maine.

Argued: Sept. 10, 2002.
Decided: Jan. 30, 2003.

Donald J. Sipe, Esq. (orally), Preti Flaherty Beliveau Pachios & Haley, LLC, Portland, (for CES), Eric J. Bryant, Esq. (orally), Office of the Public Advocate, Augusta, for appellants.

Mitchell M. Tannebaum (orally), Lisa Fink, Esq., Maine Public Utilities Commission, Augusta, William Harwood, Esq. (orally), Scott D. Anderson, Esq., Verrill & Dana, LLP, Portland, (for BHE), R. Scott Mahoney, Esq., Central Maine Power, Augusta, for appellees.

Panel: SAUFLEY, C.J., and
CLIFFORD, RUDMAN, CALKINS, and
LEVY, JJ.

LEVY, J.

[¶ 1] Competitive Energy Services, LLC and the Public Advocate appeal from an order issued by the Public Utilities Commission approving Bangor Hydro–Electric Company's petition for reorganization arising out of the creation of an affiliate, Emera Energy Services, Inc. (EES). Competitive Energy also appeals from the Commission's approval of an employee lease agreement between Bangor Hydro and EES. Competitive Energy and the Public Advocate contend that the plain language of 35–A M.R.S.A. § 3206–A(2) (Pamph.2002) prohibits the formation of EES. Competitive Energy also asserts that the employee lease agreement violates 35–A M.R.S.A. § 3205(3) (Pamph.2002), which prohibits a transmission and distribution utility from giving preferential treatment to an affiliated competitive electricity provider. We affirm the Commission's order approving Bangor Hydro's petition to reorganize and affiliate with a competitive electricity provider, and dismiss as moot the portion of Competitive Energy's appeal challenging the employee lease agreement.

## I. BACKGROUND

[¶ 2] Maine's act to restructure the State's electric industry (the Restructuring Act) [1] required that, as of March 1, 2000, investor-owned electric utilities must have divested their generation assets and activities. Because the Restructuring Act allowed the investor-owned electric utilities to keep their transmission and distribution assets, the former electricity providers were transformed into transmission and distribution utilities (T & D utilities) fully regulated by the Commission. The divested generation assets and activities then became controlled by competitive electricity providers, which were licensed by the Commission. One of the purposes of the Restructuring Act was to create a competitive market in which Maine's citizens would be able to comparison shop among various competitive electricity providers for their personal and commercial electricity generation services.

[¶ 3] As a result of the Restructuring Act, Bangor Hydro, one of Maine's three investor-owned electric utilities at the time, sold its generation assets and became a T & D utility. Soon after, Bangor Hydro agreed to sell all of its stock to become a subsidiary of Emera, Inc. (Emera), a Nova Scotia holding company. The

---

1. The Restructuring Act is codified in 35–A M.R.S.A. §§ 3201–3217 (Pamph.2002).

Commission approved the merger on January 5, 2001.

[¶ 4] Around October 2001, Emera formed EES, a competitive electricity provider, to engage in energy sales in Maine. EES and Bangor Hydro, while both subsidiaries of Emera, have different reporting routes to their holding company. On November 12, a Bangor Hydro employee, Calvin Bell, began working full-time for EES under a six-month Lease of Management Employees Agreement (Lease Agreement) entered into by Bangor Hydro and EES. On December 5, Bangor Hydro filed a petition with the Commission requesting approval of a proposed reorganization arising out of the creation of an affiliate, EES, pursuant to 35–A M.R.S.A. § 708 (1988 & Pamph.2002),[2] as well as approval of the Lease Agreement, pursuant to 35–A M.R.S.A. § 707 (1988 & Pamph.2002).[3]

2. Section 708 provides in pertinent part:

   **2. Reorganization subject to commission approval.** Reorganization shall be subject to commission approval as follows.
   **A.** Unless exempted by rule or order of the commission, no reorganization may take place without the approval of the commission. No reorganization may be approved by the commission unless it is established by the applicant for approval that the reorganization is consistent with the interests of the utility's ratepayers and investors. The commission shall rule upon all requests for approval of a reorganization within 60 days of the filing of the request for approval. If it determines that the necessary investigation cannot be concluded within 60 days, the commission may extend the period for a further period of no more than 120 days. In granting its approval, the commission shall impose such terms, conditions or requirements as, in its judgment, are necessary to protect the interests of ratepayers. These conditions shall include provisions which assure the following:
   (1) That the commission has reasonable access to books, records, documents and other information relating to the utility or any of its affiliates, except that the Public Utilities Commission may not have access to trade secrets unless it is essential to the protection of the interests of ratepayers or investors. The commission shall afford trade secrets and other information such protection from public disclosure as is provided in the Maine Rules of Civil Procedure;
   (2) That the commission has all reasonable powers to detect, identify, review and approve or disapprove all transactions between affiliated interests;
   (3) That the utility's ability to attract capital on reasonable terms, including the maintenance of a reasonable capital structure, is not impaired;
   (4) That the ability of the utility to provide safe, reasonable and adequate service is not impaired;
   (5) That the utility continues to be subject to applicable laws, principles and rules governing the regulation of public utilities;
   (6) That the utility's credit is not impaired or adversely affected;
   (7) That reasonable limitations be imposed upon the total level of investment in nonutility business, except that the commission may not approve or disapprove of the nature of the nonutility business;
   (8) That the commission has reasonable remedial power including, but not limited to, the power, after notice to the utility and all affiliated entities of the issues to be determined and the opportunity for an adjudicatory proceeding, to order divestiture of or by the utility in the event that divestiture is necessary to protect the interest of the utility, ratepayers or investors. A divestiture order shall provide a reasonable period within which the divestiture shall be completed; and
   (9) That neither ratepayers nor investors are adversely affected by the reorganization.
   35–A M.R.S.A. § 708(2)(A) (1988).

3. Section 707 provides in pertinent part:

   **3. Consent by commission.** No public utility may extend or receive credit, including the guarantee of debt, or make or receive a loan to or from an affiliated interest or make any contract or arrangement for the furnishing of management, supervision of construction, engineering, accounting, legal, financial or similar services, or for the

[¶ 5] Consequently, Competitive Energy, the Public Advocate,[4] four other organizations, and one individual[5] petitioned to intervene. At a December 13 case conference, the seven parties were granted intervenor status, and the Public Advocate raised the threshold issue of whether sec-tion 3206–A(2)[6] prohibits Bangor Hydro and Emera from affiliating themselves with a competitive electricity provider in Maine.[7] The Commission issued a January 8, 2002, order in which it found that section 3206–A(2) does not apply in situa-

furnishing of any service or real or personal property other than those enumerated with any affiliated interest until the commission finds that the contract or arrangement is not adverse to the public interest and gives the contract or arrangement its written approval.

. . . .

G. For any contract or arrangement expected to involve the use by an affiliated interest of utility facilities, services or intangibles, including good will or use of a brand name, the commission shall determine the value of those facilities, services or intangibles. When its facilities, services or intangibles are used by the affiliated interest, the utility's costs must be charged to and received from the affiliated interest based upon this value. The commission shall also determine the proper allocation of costs for shared facilities, services or intangibles. If the commission is unable to make the value determinations required by this paragraph within the time limits imposed by paragraph A, the commission may approve the contract or arrangement without making the determinations, except that the commission shall make the determinations within 60 days of approving the contract or arrangement.

35–A M.R.S.A. § 707(3) (Pamph.2002).

4. Appointed by the Governor, the Public Advocate "represent[s] the using and consuming public" in matters relating to public utilities. 35–A M.R.S.A. §§ 1701(1), 1702 (1988 & Pamph.2002).

5. Central Maine Power Company, Georgia Pacific Corporation, Industrial Energy Consumer Group, and Maine Electric Consumer Cooperative are the four other organizations. Donna L. Robinson, a "captive consumer" of Bangor Hydro, is the individual.

6. 35–A M.R.S.A. § 3206–A(2) in its entirety states:

2. **Prohibition; divestiture.** If, after the effective date of this section, 10% or more of the stock of an investor-owned transmission and distribution utility is purchased by an entity:

A. The purchasing entity and any related entity may not sell or offer for sale generation service to any retail consumer of electric energy in this State; and

B. If, in an adjudicatory proceeding, the commission determines that an affiliated competitive provider obtains an unfair market advantage as a result of the purchase, the commission shall order the investor-owned transmission and distribution utility to divest the affiliated competitive provider. If the commission orders a divestiture pursuant to this subsection, the distribution utility must complete the divestiture within 12 months of the order to divest, unless the commission grants an extension. Upon application by the distribution utility, the commission may grant an extension for the purpose of permitting the utility to complete a divestiture that has been initiated in good faith but not finalized within the 12–month period. The commission shall oversee and approve a divestiture in accordance with rules adopted pursuant to subsection 4.

7. Section 3206–A(2) is frequently referred to as the "poison pill" provision of Title 35–A because its purpose is to discourage organizations from purchasing a Maine transmission and distribution utility in order to gain a competitive advantage in the retail electricity market. Poison pill may be a misnomer, however, as the term usually refers to a corporation's planned defense against unwanted takeover bids whereby shareholders benefit to the acquirer's significant detriment, making the acquisition "prohibitively expensive." BLACK'S LAW DICTIONARY 1177–78 (7th ed.1999). While section 3206–A(2) may make the acquisition of a Maine transmission and distribution utility unattractive, it does not backfire against the purchasing entity by enriching the shareholders at the purchasing entity's expense.

tions where the purchasing entity creates an affiliated competitive electricity provider subsequent to the purchasing entity's acquisition of a T & D utility. The Commission therefore concluded that section 3206–A(2) does not prohibit EES from selling electricity to retail customers in Maine because EES was created after Bangor Hydro had been acquired by Emera.

[¶ 6] On February 5, Competitive Energy filed a notice of appeal from the January 8 order, and the Public Advocate filed its notice of appeal on February 15. We dismissed the appeal because the appeal was filed more than twenty-one days after January 8. *See* M.R.App. P. 2(b)(3). Our order did not address the interlocutory nature of the Commission's January 8 order.

[¶ 7] On March 21, the Commission approved with conditions Bangor Hydro's petition to reorganize and affiliate itself with EES, and also approved the Lease Agreement. Competitive Energy and the Public Advocate filed timely notices of appeal. In their notices, the parties referred to the Commission's interpretation of section 3206–A(2) in the January 8 order as incorrect and unlawful. Competitive Energy alone appealed the part of the March 21 order which approved the Lease Agreement. We consolidated the two appeals.

[¶ 8] On April 25, Bangor Hydro filed a motion to dismiss the part of Competitive Energy's appeal that involves the Commission's January 8 order which concluded that section 3206–A(2) does not prohibit EES from selling electricity to retail customers in Maine. Five days later, Bangor Hydro filed a request with the Commission asking it to remove four of the five conditions imposed on the Lease Agreement in the March 21 order and approve a termination of the Lease Agreement so that Mr. Bell could become a full-time employee of EES. On June 11, the Com-

mission issued an order in which it treated Bangor Hydro's April 30 request "as a new petition," rescinded the four conditions as no longer necessary once the Lease Agreement terminated, approved the termination of the Lease Agreement as it applied to any Bangor Hydro employee, and stated in a footnote that "any future employee lease arrangement will require Commission approval."

## II.   ISSUES PRESENTED

[¶ 9] The following issues are presented: (1) whether the dismissal of Competitive Energy's appeal of the January 8 order precludes the Commission's interpretation of section 3206–A(2) from being considered in this appeal of the March 21 order because the March 21 order does not mention or otherwise address section 3206–A(2);   (2) whether section 3206–A(2) prohibits Bangor Hydro from having an affiliated competitive electricity provider in Maine;   and (3) whether the March 21 approval of the Lease Agreement is rendered moot by the June 11 order of the Commission approving the termination of the agreement and, if not, whether the agreement is consistent with section 3205(3) of the Restructuring Act, which prohibits a T & D utility and its employees from giving preferential treatment to an affiliated competitive electricity provider.

## III.   DISCUSSION

A.   Effect of the Law Court's Dismissal of the Appeal from the Commission's January 8 Order

■ [¶ 10] Bangor Hydro contends that this appeal is untimely with regard to the issue addressed in the Commission's January 8 order because the order was a final determination of the potentially dispositive issue of the Commission's interpretation of section 3206–A(2), and the present appeal was not filed within 21 days of the January

8 order. *See* M.R.App. P. 2(b)(3). Competitive Energy and the Public Advocate respond that because the January 8 order merely decided a threshold legal issue concerning the Restructuring Act, their appeal from the March 21 order is the proper vehicle to challenge the Commission's interpretation of section 3206–A(2), even though the March 21 order does not address the issue.

▮ [¶ 11] When an order by the Commission decides some general questions of law and fact, but leaves open future actions by the Commission and does not approve specific requests, the order is not a final judgment. *Mech. Falls Water Co. v. Pub. Utils. Comm'n,* 381 A.2d 1080, 1087 (Me.1977). A final judgment lies " 'in its effect in concluding the rights of the party appealing; if his rights are concluded so that further proceedings after the ruling cannot affect them, there is a final judgment.' " *Murphy v. Maddaus,* 2002 ME 24, ¶ 13, 789 A.2d 1281, 1285 (quoting *Hazzard v. Westview Golf Club, Inc.,* 217 A.2d 217, 222–23 (Me.1966)). When an appeal is made from a final judgment, "any claim of error in the record" is subject to appellate review. M.R.App. P. 2(b)(4).

[¶ 12] Applying the *Mechanic Falls* criteria, the January 8 order is not a final judgment because it approved none of the specific requests in Bangor Hydro's December 5 petition and left open the issue as to whether the Commission would (1) grant permission to Bangor Hydro to reorganize and affiliate with EES, and (2) approve the Lease Agreement. Instead, the January 8 order merely decided one question of law: whether section 3206–A(2) prohibits Bangor Hydro from affiliating itself with a competitive electricity provider in Maine. Because the January 8 order decided a threshold legal issue and is part of the record of this appeal, the issue of whether section 3206–A(2) prohibits Bangor Hydro from affiliating with a competitive electricity provider in Maine may be addressed in this appeal.

B. The Commission's Interpretation of Section 3206–A(2)

▮ Section 3206–A(2) provides in pertinent part:

**2. Prohibition; divestiture.** If, after the effective date of this section, 10% or more of the stock of an investor-owned transmission and distribution utility is purchased by an entity:

**A.** The purchasing entity and any related entity may not sell or offer for sale generation service to any retail consumer of electric energy in this State; and

**B.** If, in an adjudicatory proceeding, the commission determines that an affiliated competitive provider obtains an unfair market advantage as a result of the purchase, the commission shall order the investor-owned transmission and distribution utility to divest the affiliated competitive provider.

[¶ 13] Competitive Energy and the Public Advocate contend that the Commission misconstrued section 3206–A(2) when it found ambiguity in the statute's plain language and then interpreted the section as permitting Bangor Hydro's reorganization such that it would be affiliated with EES. Specifically, they assert that the Commission erred when it concluded that the term "related entity" in subsection (A) of section 3206–A(2) only bars marketing affiliates associated with a "purchasing entity" at the time of the purchasing entity's acquisition of a Maine T & D utility. They contend that a "related entity" is prohibited by subsection (A) from selling electricity in Maine even if it is created after the completion of a purchasing entity's acquisition of a T & D utility.

[¶ 14] The Commission counters that section 3206–A(2) is ambiguous largely because the Restructuring Act's definitions

do not offer clear guidance as to when a T & D utility purchased by a "purchasing entity" and governed by subsection (A) at the time of the purchase, becomes an "investor-owned transmission and distribution utility" governed by subsection (B) following the purchase. Both Bangor Hydro and the Commission contend that the Commission reasonably concluded that once Emera had completed its acquisition of Bangor Hydro, Emera was, in fact, no longer a "purchasing entity." Under this view, EES does not constitute a "related entity" of Bangor Hydro subject to subsection (A) because EES did not exist at the time of Emera's purchase of Bangor Hydro. In support of its construction of section 3206–A(2), the Commission cited the following legislative purpose in its January 8 order:

> [T]he Legislature could have had a rational concern regarding corporations with an established marketing affiliate presence in Maine seeking to gain a competitive advantage through the purchase of a Maine T & D utility. To avoid the potential negative impact on Maine's retail electricity market, the Legislature could have logically decided to prohibit a pre-existing marketing affiliate of a purchasing entity from continuing retail electricity sales in Maine after the acquisition.
>
> .... The Restructuring Act does not have an outright prohibition against T & D utility marketing affiliates; rather, the Act specifically allows T & D utilities to have marketing affiliates in some circumstances subject to strict oversight by the Commission. This reveals a legislative view that the Commission has adequate authority to police and remedy market abuses or unfair advantages that might result from T & D utility affiliation. Thus, we find it appropriate to interpret the Act as not prohibiting the creation of an additional competitor

when, as here, the language of the Act does not clearly mandate such a result.

[¶ 15] When reviewing an agency's interpretation of a statute that is both administered by the agency and within the agency's expertise, we apply a two-part inquiry. *Guilford Transp. Indus. v. Pub. Utils. Comm'n*, 2000 ME 31, ¶ 11, 746 A.2d 910, 913. First, we determine de novo whether the statute is ambiguous or unambiguous. *Id.* ¶¶ 11, 13, 746 A.2d at 913, 914. Ambiguous language is described as language that "is reasonably susceptible of different interpretations." *Id.* ¶ 14, 746 A.2d at 914 (quoting *Portland Valve, Inc. v. Rockwood Sys. Corp.*, 460 A.2d 1383, 1387 (Me.1983)). Then, we either review the Commission's construction of the ambiguous statute for reasonableness or plainly construe the unambiguous statute. *Guilford*, 2000 ME 31, ¶¶ 11, 13, 746 A.2d at 913, 914. An agency's interpretation of an ambiguous statute it administers is reviewed with "great deference and will be upheld unless the statute plainly compels a contrary result." *Mar. Energy v. Fund Ins. Review Bd.*, 2001 ME 45, ¶ 7, 767 A.2d 812, 814 (internal quotations omitted). Generally, decisions of the Commission are reviewed only to " 'determin[e] whether the agency's conclusions are unreasonable, unjust or unlawful in light of the record.' " *Guilford*, 2000 ME 31, ¶ 6, 746 A.2d at 912 (quoting *Pine Tree Tel. & Tel. Co. v. Pub. Utils. Comm'n*, 634 A.2d 1302, 1304 (Me. 1993)).

[¶ 16] The first step of our inquiry is to determine whether section 3206–A(2) is ambiguous; that is, "reasonably susceptible of different interpretations," without deferring to the Commission's conclusion that the statutory language is ambiguous. Competitive Energy and the Public Advocate interpret subsection (A) of section 3206–A(2) as being a flat prohibition of the selling of electricity in Maine by any entity

that purchases a T & D utility or any affiliated company that meets the definition of "related entity" pursuant to section 3205(1)(D) (Pamph.2002),[8] whether the entity was created before, during, or after the purchase of the T & D utility. This construction is reasonable because the Restructuring Act's definition of the term "purchasing entity" as "a person that purchases 10% or more of the stock of a distribution utility on or after the effective date of this section" does not address the question of whether an entity should continue to be viewed as a "purchasing entity," 35–A M.R.S.A. 3205(1)(C) (Pamph. 2002), subject to subsection (A) once the purchase is completed. It follows from this construction that subsection (B) would only apply in situations in which a T & D utility had an existing competitive electricity provider marketing affiliate at the time the utility was acquired by a "purchasing entity."

[¶ 17] The Commission and Bangor Hydro's interpretation that subsection (A) of section 3206–A(2) does not apply to a competitive electricity provider affiliated with a previously acquired T & D utility is also reasonable if one views the term "related entity," as used in subsection (A), as an entity that had to exist and be related to the purchasing entity at the time of the purchase. Under this view, subsection (A) does not apply to a competitive electricity provider that becomes affiliated with a previously acquired T & D utility, and

subsection (B) provides a divestiture remedy if such a competitive electricity provider gains an unfair market advantage as a result of the earlier purchase.

[¶ 18] Because the language of section 3206–A(2) is reasonably susceptible to two different interpretations, it is ambiguous. We therefore review the Commission's construction of the statute for reasonableness, affording great deference to the Commission's construction. In addition, "[w]e avoid statutory constructions that create absurd, illogical or inconsistent results." *Darling's v. Ford Motor Co.*, 1998 ME 232, ¶ 5, 719 A.2d 111, 114.

[¶ 19] The Commission's construction of this provision finds support in the Restructuring Act's employment of the terms "related entity" in subsection (A) and "affiliated competitive provider" in subsection (B). EES did not exist and, therefore, did not constitute a "related entity" of a "purchasing entity" subject to subsection (A) at the time of Emera's purchase of Bangor Hydro. Because EES was formed subsequent to Emera's purchase of Bangor Hydro, EES does qualify as an "affiliated competitive provider" of a T & D utility at the time of EES's formation, subject to subsection (B). The Restructuring Act defines an "affiliated competitive provider" as "a competitive electricity provider whose relationship with a large investor-owned transmission and distribution utility qualifies it as an affiliated interest." 35–A

---

**8.** Section 3205(1)(D) defines "related entity" as:

(1) Any person who owns, directly, indirectly or through a chain of successive ownership, 10% or more of the voting securities of the purchasing entity;
(2) Any person 10% or more of whose voting securities are owned, directly or indirectly, by an affiliated interest as defined in subparagraph (1);
(3) Any person 10% or more of whose voting securities are owned, directly or indirectly, by a purchasing entity;

(4) Any person, or group of persons acting in concert, which the commission may determine, after investigation and hearing, exercises substantial influence over the policies and actions of a purchasing entity, provided that the person or group of persons beneficially owns more than 3% of the purchasing entity's voting securities; or
(5) Any purchasing entity of which any person defined in subparagraphs (1) to (4) is an affiliated interest.
35–A M.R.S.A. § 3205(1)(D) (Pamph.2002).

M.R.S.A. § 3205(1)(A) (Pamph.2002).[9] Therefore, at the time of Bangor Hydro's December 2001 petition seeking approval for reorganization arising out of the formation of EES, both Bangor Hydro, as a T & D utility, and EES, as an "affiliated competitive provider," met the Restructuring Act's organizational terms subjecting them to subsection (B), and not to subsection (A).

■■■■ [¶ 20] Accordingly, the Commission's construction of section 3206–A(2) is both reasonable and logical: A "purchasing entity" is an entity in the process of purchasing 10% or more of the stock of a T & D utility, and the "purchasing entity" and any "related entities" are subject to subsection (A); but once the stock is acquired, the "purchasing entity" and any "related entities" become "affiliated interests" of a T & D utility subject to regulation under subsection (B).[10] This construction of the prohibition established in subsection (A) is consistent with the view that a preexisting marketing affiliate of a "purchasing entity" would be more likely to gain an unfair advantage as a result of the acquisition of a T & D utility than would a marketing affiliate created after a purchase. A preexisting marketing affiliate would have an established market share, and its established operations would not have been subject to scrutiny and pri-

or approval by the Commission. In contrast, a marketing affiliate created subsequent to the acquisition of a T & D utility by a "purchasing entity" begins operation with no market share at the time of its licensure by the Commission. Limiting subsection (A)'s prohibition to competitive electricity providers affiliated with a purchasing entity at the time of a purchase of a T & D utility, and subjecting subsection (B)'s divestiture provision to competitive electricity providers created after a purchase, is consistent with the Restructuring Act's overall purpose of fostering "effective competition in the market for the generation and sale of electricity in the State and [providing] an orderly transition from the current form of regulation to retail access...." 35–A M.R.S.A. § 3203(1) (Pamph.2002).

[¶ 21] We conclude that the Commission's construction of section 3206–A(2)(A) is reasonable and entitled to deference. Subsection (A) prohibits a competitive electricity provider from selling or offering for sale generation service to retail consumers of electric energy in Maine if the competitive electricity provider was a "related entity" to a "purchasing entity" at the time of the latter's purchase of a T & D utility. Because EES was not in existence at the time Emera acquired Bangor

9. An "affiliated interest" is defined in section 707(1)(A) as:

(1) Any person who owns directly, indirectly or through a chain of successive ownership, 10% or more of the voting securities of a public utility;

(2) Any person, 10% or more of whose voting securities are owned, directly or indirectly, by an affiliated interest as defined in subparagraph (1);

(3) Any person, 10% or more of whose voting securities are owned, directly or indirectly, by a public utility;

(4) Any person, or group of persons acting in concert, which the commission may determine, after investigation and hearing, ex-

ercises substantial influence over the policies and actions of a public utility, provided that the person or group of persons beneficially owns more than 3% of the public utility's voting securities; or

(5) Any public utility of which any person defined in subparagraphs (1) to (4) is an affiliated interest.

35–A M.R.S.A. § 707(1)(A) (1988).

10. This construction is congruent with the Restructuring Act's use of the word "purchasing" to describe the type of entity subject to the prohibition contained in section 3206–A(2)(A). "Purchasing" is a present participle of the verb "purchase," indicating the present tense.

Hydro, EES was not a "related entity" and is not barred from selling electricity in Maine pursuant to subsection (A). We therefore affirm that part of the Commission's March 21 order approving, with conditions, Bangor Hydro's petition for reorganization arising out of the creation of an affiliate, EES.

### C. The Commission's Approval of the Lease Agreement

[¶ 22] Bangor Hydro contends that because the Commission had already approved the termination of the Lease Agreement by an order dated June 11, 2002, Competitive Energy's challenge to the Lease Agreement is moot. Competitive Energy argues that because the June 11 order does not reconsider or void the Commission's March 21 ruling approving the Lease Agreement with conditions, the part of the March 21 order which finds the Lease Agreement between Bangor Hydro and EES to be lawful still stands and can be used as precedent. Competitive Energy further contends that the issue falls within the "great public concern" and "capable of repetition but evading review" exceptions to the mootness doctrine.

[¶ 23] If a case does not involve a real, substantial, and live controversy that can be resolved by specific relief from an appeal, then the case is moot. *Lewiston Daily Sun v. Sch. Admin. Dist. No. 43*, 1999 ME 143, ¶¶ 12–13, 738 A.2d 1239, 1242–43. Three exceptions to the mootness doctrine are recognized: sufficient collateral consequences, questions of great public concern, and issues capable of repetition but evading review. *Id.* ¶ 17, 738 A.2d at 1243.

[¶ 24] Here, the termination of the Lease Agreement between Bangor Hydro and EES was approved by the Commission on June 11.[11] In a footnote in its order, the Commission clarified that the Lease Agreement as it applies to any Bangor Hydro employee, not just Mr. Bell, had been terminated and that "any future employee lease arrangement will require Commission approval." Because the Lease Agreement no longer exists, it no longer presents a real, substantial, and live controversy that could be resolved by specific relief from this appeal. Thus, Competitive Energy's challenge of the Lease Agreement is moot.

[¶ 25] The determination of mootness is not complete, however, until it is determined that none of the three established exceptions apply. We turn to consider the two exceptions raised by Competitive Energy. We will entertain an otherwise moot appeal when there are " 'questions of great public concern that, in the interest of providing future guidance to the bar and the public, [the Court] may address....' " *Monroe v. Town of Gray*, 1999 ME 190, ¶ 5, 743 A.2d 1257, 1258–59 (alteration in original) (quoting *Halfway House, Inc. v. City of Portland*, 670 A.2d 1377, 1380 (Me.1996)). While Competitive Energy argues that this exception is applicable because of concerns relating to the anti-competitiveness associated with utilities favoring their affiliates, the unique nature of the Lease Agreement takes it outside the arena of issues of great public concern on which the bar and public need guidance.

[¶ 26] A separate exception to the mootness doctrine exists for "issues [that]

---

11. The filing of this appeal from the March 21 order of the Commission did not stay or suspend the effectiveness of the order. *See* 35–A M.R.S.A. § 1320(7) (1988). In addition, "[t]he Commission may at any time rescind, alter or amend any order it has made ...." 35–A M.R.S.A. § 1321 (Pamph.2002). The action taken by the Commission on June 11 in the new proceeding is not reviewed in this appeal.

are capable of repetition but evade review because of their fleeting or determinate nature[,]" *id.,* which is applicable if there is a " 'reasonable expectation' or 'demonstrated probability' that the same controversy will recur involving the same complaining party." *Sordyl v. Sordyl,* 1997 ME 87, ¶ 7, 692 A.2d 1386, 1388 (quoting *Taxpayers for the Animas–La Plata Referendum v. Animas–La Plata Water Conservancy Dist.,* 739 F.2d 1472, 1479 (10th Cir.1984)). Competitive Energy is particularly concerned that utilities may develop a "petitioning and terminating habit" that could cause less wealthy parties such as Competitive Energy to deplete resources appealing agreements, only to have the agreements terminated "at the eleventh hour." We conclude, however, that Competitive Energy has failed to demonstrate that it is probable that Competitive Energy will find itself with a competitor who leases an employee from an affiliate in accordance with the same Lease Agreement or an agreement that is similar, or that Bangor Hydro or another T & D utility will terminate such agreements in the future to evade judicial review.

[¶ 27] Because none of the established exceptions apply, we conclude that the portion of Competitive Energy's appeal dealing with the Lease Agreement is moot, and we do not reach the question of whether the Lease Agreement violated the provision of section 3205(3) of the Restructuring Act.

The entry is:

The part of the appeal pertaining to the Lease of Management Employees Agreement is dismissed as moot. The March 21, 2002 Order of the Public Utilities Commission is otherwise affirmed.