2009 ME 76

**ADOPTION OF PATRICIA S.**

Supreme Judicial Court of Maine.

Argued: Nov. 18, 2008.

Decided: July 23, 2009.

Catherine R. Connors, Esq. (orally), Clifford H. Ruprecht, Esq., Pierce Atwood LLP, Portland, ME, for Patricia S.

Stephen W. Hanscom, Esq. (orally), Crandall, Hanscom & Collins, P.A., Rockland, ME, for Thomas J. Watson III and George J. Gillespie III, Trustees.

Panel: SAUFLEY, C.J., and CLIFFORD, ALEXANDER, LEVY, SILVER, MEAD, and GORMAN, JJ.

CLIFFORD, J.

[¶ 1] Patricia S. appeals from a summary judgment entered in the Knox County Probate Court (*Emery, J.*) in favor of Thomas J. Watson III and George J. Gillespie III, as trustees of two trusts, on their petition to annul party-in-interest Olive W.'s 1991 adoption of Patricia. Patricia contends that the court erred in determining that, as the person being adopted, she did not live in Maine at the time of the adoption, and therefore, did not comply with the requirement of the then-existing adoption statute. This finding, Patricia argues, is based on an incorrect construction of the adoption statute, and led the court to improperly enter a summary judgment annulling the adoption. The trustees, in addition to defending the court's entry of a summary judgment in their favor, also cross-appeal, contending that the summary judgment could and should have been entered in their favor on the alternate ground that the adoption was contrary to public policy. Because we disagree with the Probate Court's interpretation of the ambiguous adoption statute and conclude that Patricia's construction of that statute, and her actions based on that construction, did not constitute a fraud on the court sufficient to annul the 1991 adoption as a matter of law, and because we are unpersuaded by the contention of the trustees in their cross-appeal, we vacate the summary judgment.

## I. BACKGROUND

[¶ 2] Viewing the facts in the light most favorable to the non-prevailing party, Patricia, the following evidence is established in the summary judgment record. *See McIntyre v. Nice,* 2001 ME 174, ¶ 7, 786 A.2d 620, 621. Olive and Patricia became involved in an intimate relationship in 1979. Early in their relationship, Patricia left her job and moved with Olive to New York. For the duration of their relationship, Patricia was financially dependent on Olive.

[¶ 3] Olive and Patricia spent two to four weeks each summer at a home in North Haven, Maine, which was owned by Olive. The home was furnished with some personal belongings, a boat and a car were kept at the home permanently, the grounds were cared for year-round, and Olive paid Maine property taxes on the property.

[¶ 4] In order to protect Patricia financially, Olive and Patricia sought legal advice as to whether Olive could adopt Patricia. The State of New York prohibited such adult adoptions between same-sex couples at that time. Both New York and Maine counsel advised the couple, however, that pursuant to the provisions of the adoption statute then in effect, Maine Probate Courts could grant adoptions if either

the adopting party resided in Maine, or the party being adopted lived in Maine.[1] *See* 19 M.R.S.A. § 531 (Supp.1991). Maine counsel further advised them that the summer home in North Haven, located in Knox County, would likely provide a sufficient connection to Maine to confer jurisdiction to the Knox County Probate Court to allow it to grant the adoption.

[¶ 5] In 1991, on the advice of Maine counsel, Olive petitioned the Knox County Probate Court to adopt Patricia. In the petition, Patricia listed the North Haven address as the place where she lived at the time, and Olive listed her New York address as the place where she resided at the time. Patricia and Olive spent approximately three weeks prior to the adoption at the North Haven home in 1991. During the uncontested adoption hearing, Patricia was not asked how long she had lived in North Haven, and did not volunteer the information that the North Haven home listed in the petition as the place where she "lives" was a vacation home, or that she had been there for only three weeks preceding the hearing.

[¶ 6] With Patricia's consent, the court issued a decree of adoption dated August 21, 1991. Less than a year later, in July of 1992, Patricia and Olive ended their intimate relationship.

[¶ 7] Watson and Gillespie are trustees of two trusts in Olive's family in which Patricia may be entitled to share as a legal grandchild by virtue of her status as Olive's adopted daughter. On September 8, 2005, the trustees filed a petition in the Probate Court seeking annulment of the adoption and a declaratory judgment that the adoption is null and void.[2] In it, they alleged that the couple obtained the adoption by fraud in that they did not disclose their relationship to the court, and because, as New York residents at the time, Patricia and Olive had not fulfilled the statutory requirements of living or residing in Maine necessary to give the Knox County Probate Court jurisdiction to issue the decree of adoption.[3] *See* 18–A M.R.S. § 9–315(a) (2008).

[¶ 8] Patricia moved for a summary judgment on the ground that it was undisputed that she lived in Maine in 1991 within the meaning of the adoption statute, and argued that the trustees were barred from collaterally attacking the adoption based on fraud. In a decision dated April 17, 2008, the court concluded that it lacked jurisdiction in 1991 to entertain Olive's adoption petition because the undisputed facts established that Patricia did not live in Maine and Olive did not reside in Maine at that time within the meaning of the then-existing adoption statute, 19 M.R.S.A. § 531. The court thus permitted a collateral attack on the adoption on the basis of fraud, and entered a summary judgment annulling the adoption. Patricia filed this appeal.[4]

---

1. Section 531 was repealed and replaced in 1995, four years after Olive's adoption of Patricia. *See* P.L. 1995, ch. 694, § C–7 (effective Oct. 1, 1997) (codified at 18–A M.R.S. §§ 9–104(b), 9–301 (2008)).

2. As the Probate Court correctly concluded, the trustees have standing to challenge this adoption, to which they were not parties, based on their statutory duty to protect the trust property. *See* 18–B M.R.S. § 816(24) (2008).

3. Initially, the Probate Court issued a default judgment against Patricia on the ground that she failed to timely respond to the petition. Patricia appealed the default judgment to this Court. By decision dated January 6, 2007, we vacated the default judgment and remanded to the Probate Court after determining that Patricia received insufficient service of process; we did not address the merits of the trustees' petition. *Adoption of Spado*, 2007 ME 6, ¶ 15, 912 A.2d 578, 583.

4. Olive has filed no pleadings in the matter, nor any brief on appeal.

## II. DISCUSSION

[¶ 9] Patricia argues that she complied with all the requirements of the adoption statute in effect at the time of the adoption, and that the court erred in issuing a judgment in favor of the trustees annulling her adoption by Olive. Alternatively, she argues that even if she was not in full compliance with the statute, there is insufficient evidence that she committed fraud to justify annulment of the 1991 adoption. The trial court's jurisdiction and authority to issue a particular decision are matters of law subject to de novo review. *In re Cyr,* 2005 ME 61, ¶¶ 11–12, 873 A.2d 355, 359.

### A. Adoption Residency Requirements

[¶ 10] In August of 1991, at the time of Olive's adoption of Patricia, Maine's adoption statute provided, in pertinent part:

> Any husband and wife jointly, or any unmarried person, resident or nonresident of the State, may petition the Probate Court to adopt a person, *regardless of age,* and for a change of his name. The fee for filing the petition shall be $10. Jurisdiction to grant the adoption and change of name shall be in the *county where the person to be adopted lives or the county where the petitioner resides* or the petitioners reside or in the county in which the placing agency having custody of the child is located.

19 M.R.S.A. § 531 (emphases added). Pursuant to these requirements of former section 531, Olive asserted in her adoption petition that her residence was in New York, New York; Patricia listed her address at Oak Hill Farm in North Haven as the place where she lived. Because Olive listed New York as her residence, the court's jurisdiction and its authority to grant Olive's adoption of Patricia had to be based solely on Patricia's assertion that she "lived" in Maine at the time.

[¶ 11] To determine whether Patricia "lived" in Maine in 1991, we must construe section 531. In construing the meaning of a statute, we look first to the plain language of the statute "as a means of effecting the legislative intent." *Home Builders Ass'n of Me., Inc. v. Town of Eliot,* 2000 ME 82, ¶ 4, 750 A.2d 566, 569 (quotation marks omitted). "Only if the language of a statute is ambiguous will we look beyond it to the legislative history or other external indicia of legislative intent." *Irving Pulp & Paper, Ltd. v. State Tax Assessor,* 2005 ME 96, ¶ 8, 879 A.2d 15, 18. "Ambiguous language is described as language that is reasonably susceptible of different interpretations." *Competitive Energy Servs. LLC v. Pub. Utils. Comm'n,* 2003 ME 12, ¶ 15, 818 A.2d 1039, 1046 (quotation marks omitted). Further, "[t]he meaning of a statute must be construed in light of the subject matter, purpose of the statute, and the consequences of a particular interpretation." *Home Builders Ass'n,* 2000 ME 82, ¶ 14, 750 A.2d at 571 (quotation marks omitted).

[¶ 12] According to the plain language of section 531, the connection to the State of Maine required of the person petitioning to adopt is different from that required of the person being adopted. Adoption jurisdiction is conferred on the Probate Court of a county when an adoptee "lives" in that county. Alternatively, the Probate Court has jurisdiction when the petitioner "resides" in the county. The clear implication of the use of those different terms in the statute is that "lives" and "resides" have different meanings. "Residence" constitutes a legal term of art that is applied in many different circumstances. *See, e.g.,* 6 M.R.S. § 3(29) (2008) (defining "resident" within the Maine Aeronautics Act as "a person who has resided and made his home not less than 6 months next prior to his application for registration continuously within the State"); 21-A M.R.S.

§ 112(1) (2008) (defining a person's residence for purposes of voting as the location "where the person has established a fixed and principal home to which the person, whenever temporarily absent, intends to return"). "Lives," however, is not defined in the statute itself and has no common law definition.

[¶ 13] In determining that the trustees were entitled to a summary judgment, the Probate Court concluded that "lives" and "resides" in 19 M.R.S.A. § 531 had the same meaning, and therefore, because Patricia could not be said to reside in Maine in August of 1991, the adoption was invalid. We disagree with the Probate Court. If the Legislature had intended to create identical requirements for connections to Maine as to both the adopting party and the party being adopted, it could have used the same term as to both parties. Instead, it employed different words to apply to the petitioner and to the person being adopted. There is no indication in the statute as to what kind of "living" would meet the statutory requirement, or how long the adopted person would have to live in Maine to give the Probate Court jurisdiction to grant an adoption pursuant to section 531. Given the language used in section 531, and the lack of any definitional assistance from the statute itself, the statute is ambiguous and we look to the legislative history of section 531. *See Irving Pulp & Paper,* 2005 ME 96, ¶ 8, 879 A.2d at 18.

[¶ 14] "Live" and "reside" have long been used in the adoption statute. Maine's first adoption statute was enacted in 1855; it allowed "[a]ny inhabitant of this state" to petition for adoption "in the county wherein he or she may reside." P.L. 1855, ch. 189, § 1. By 1915, the statute

had been amended to allow "[a]ny unmarried inhabitant of the State" to petition the probate court "for their county," and had been expanded to allow an unmarried inhabitant of another state to petition for adoption in the "county where such child lives." P.L. 1915, ch. 292.

[¶ 15] The availability of adoptions based on where the adoptee lives remained constant from 1915 until Patricia's adoption in 1991; when the petitioners were nonresidents, the statute required that the adoptee "live" in the county in which an adoption petition was filed.[5] Although, as a general matter, the evolution of the adoption statute reflects a pattern of expanding the availability of adoptions, *see, e.g.,* P.L. 1916, ch. 72, § 35 (allowing nonresident petitioners to adopt resident children); P.L. 1939, ch. 145, § 35 (eliminating the requirement that a person adopted by a married couple be a minor); P.L. 1945, ch. 68, § 35 (eliminating the requirement that a person adopted by an unmarried person be a minor), through almost eighty years of amendments, the Legislature never defined "lives" in any version of the adoption statute.

[¶ 16] We construe liberally the adoption statute, which is now part of the Probate Code. *See* 18–A M.R.S. § 1–102(a) (2008) ("This Code shall be liberally construed and applied to promote its underlying purposes and policies."). The goal of expanding the availability of adoptions in Maine, however, must be read in the context of the statutory authority and personal jurisdiction of the Probate Court over the parties to the adoption. The Maine court system is intended to be available to Maine residents and to those who have

---

5.  The current version of the adoption statute, enacted subsequent to the parties' 1991 adoption, eliminates the distinction between "lives" and "resides," and instead refers to the residence of both the petitioner and the adoptee: "the petition for adoption must be filed in the county where the adoptee resides or where the petitioners reside." 18–A M.R.S. § 9–104(b) (2008); P.L. 1995, ch. 694, § C–7 (effective Oct. 1, 1997).

other adequate ties to the State to justify state court intervention in their lives. Maine's long arm statute, 14 M.R.S. § 704–A (2008), for example, enumerates the minimal contacts required to give Maine courts jurisdiction over nonresident persons.

[¶ 17]   Certainly the best interest of the person being adopted, usually a minor child, is of primary importance in determining the intent of the adoption statute. 18–A M.R.S. § 9–308(a)(5) (2008) (stating that the express purpose of the Adoption Act is to serve "[t]he best interests of the adoptee"); *see also Adoption of M.A.,* 2007 ME 123, ¶ 24, 930 A.2d 1088, 1096 (stating that "[a]doption statutes, as well as matters of procedure leading up to adoption, should be liberally construed to carry out the beneficent purposes of the adoption institution and to protect the adopted child in the rights and privileges coming to it as a result of the adoption") (quotation marks omitted).   In determining those best interests, the court must strive "to give the adoptee a permanent home at the earliest possible date."   18–A M.R.S. § 9–308(b).

[¶ 18]   Most persons adopted are minor children, and there are significant public policy considerations inherent in the adoption of minor children.   Minor children subject to adoption are often in unstable circumstances and may be subject to frequent moves.   Requiring an indication of intent on the part of a child to remain in or return to a location, as is necessary to establish residency, can be impractical. Further, it may be difficult for infants to comply with long durational residency requirements, just by virtue of the shortness of their lives.   It makes sense to require a connection to Maine for adoption of minor children different, and less stringent, than residency.   "Lives," then, means something different than resides, *see Adoption of G.,* 502 A.2d 1044, 1045–47 (Me.1986) (regarding the jurisdiction of the Cumberland County Probate Court over the adoption of a child born in Cumberland County and living there for only three days), and the "lives" language in section 531 was most likely placed in the statute to facilitate the adoption of minor children.   The "regardless of age" language of the statute, however, makes clear that the statute also governs adult adoptions, such as the adoption that is the subject of this case. *See* P.L. 1959, ch. 145, § 35 (eliminating the requirement that a person adopted by a married couple must be a minor).

[¶ 19]   The circumstances of an adult adoption are likely to be different from the adoption of a minor child.   The elements of residency could more easily be applied to adults like Patricia, who can establish a home, purchase real estate, make decisions regarding where to live and for how long, pay taxes, obtain a driver's license, vote, and obtain employment.   The language of the adoption statute, however, makes no express distinction between minor children and adults in its provision that the adoptee is required only to "live," and need not "reside," in Maine.

[¶ 20]   The summary judgment record establishes that Patricia and Olive spent three weeks at Olive's home in Maine in August of 1991, that they had done so for several years prior to the adoption, that a boat and car were kept there, that various clothes and personal belongings were kept there, that the home was furnished, and that the grounds of the home were kept year-round.   The facts regarding the amount and nature of Patricia's time in Maine are not in dispute.   The issue before us is whether Patricia's statement to the Probate Court in the petition for adoption that she was "living" in Maine in August of 1991 was fraudulent, and so contrary to the letter and spirit of section 531, that the adoption can be annulled. We conclude that it was not.

[¶ 21]  As we have already discussed, the clear implication of the use of two different terms in section 531 is that "living" is a different, and less rigorous, standard than "residing."  We need not determine, however, precisely what kind of "living" in Maine an adult adoptee would have to demonstrate in order for a Maine Probate Court to have jurisdiction to grant a petition for adoption.  This is so because to justify the annulment of an adoption, the trustees must prove that a fraud was perpetrated on the court:  "A judge of probate may, on petition of 2 or more persons and after notice and hearing, reverse and annul a decree of the Probate Court" for either of two reasons:  (1) if "[t]he court finds that the adoption was obtained as a result of fraud, duress or illegal procedures," or (2) if "[t]he court finds other good cause shown consistent with the best interest of the child."  18–A M.R.S. § 9–315(a).[6]

■ [¶ 22]  To succeed in overturning the eighteen-year-old adoption decree in this case, the trustees must prove fraud by clear and convincing evidence.  *See Rand v. Bath Iron Works Corp.*, 2003 ME 122, ¶ 9, 832 A.2d 771, 773.  The facts that must be proved are:  (1) Olive and Patricia made a false representation;  (2) of a material fact;  (3) with knowledge of its falsity or with reckless disregard of whether it was true of false;  (4) for the purpose of inducing the Probate Court to act or to refrain from acting in reliance on the false representation;  and (5) the Probate Court relied on the representation as true and acted on it to its detriment.  *See Me. Eye Care Assocs. P.A. v. Gorman*, 2008 ME 36, ¶¶ 12–15, 942 A.2d 707, 711–12 (addressing the elements of a fraud claim generally).

[¶ 23]  Even if Patricia, as an adult person being adopted, was ultimately incorrect in asserting that in the summer of 1991 she "lived" in Knox County within the meaning of section 531, it is difficult to conclude that her actions—based on a reasonable legal interpretation of an ambiguous statute—amount to a fraud on the court sufficient to justify annulment of the 1991 adoption.  To the contrary, from all that appears in the summary judgment record, both Olive and Patricia relied and acted on the advice of experienced counsel who had identified Maine, the location of their summer home, as a place where, by staying a few weeks, Patricia could qualify as a person with sufficient ties to Maine to be eligible for adoption.  Although acting in good faith on legal advice may not be enough to prevent a court from setting aside every action taken on that basis, there is insufficient evidence of fraud on the court in this case to justify annulment of an eighteen-year-old decree.  To hold otherwise would too easily subject many older judgments to collateral attack.  Further, identifying and utilizing special provisions or exceptions in the law is not improper, and does not constitute fraud.

[¶ 24]  Thus, even assuming Patricia, as an adult adoptee, did not "live" in Maine in 1991 within the meaning of section 531, the adoption should not have been annulled because there is insufficient evidence, as a matter of law, to establish the requisite fraud to annul that adoption pursuant to 18–A M.R.S. § 9–315(a).  The trustees have failed to establish sufficient facts to support their claim that Patricia committed a fraud on the court.

■ [¶ 25]  In their cross-appeal, the trustees contend that Olive's adoption of Patricia should be annulled based on a public policy of prohibiting adoptions involving same-sex couples.  We are unpersuaded by the trustees' contention.  There are a multitude of valid legal reasons why

6.  Only the fraud inquiry is relevant to the present matter.

one adult would choose to adopt another adult. Historically, adult adoptions have been recognized as a means to convey inheritance rights, to formalize an already existing parent-child relationship, or to provide perpetual care to a disabled adult adoptee. *See In re P.B.*, 392 N.J.Super. 190, 920 A.2d 155, 156–57 (Law Div.2006). Although the current version of Maine's adoption statute requires the adoption petitioner to swear that he or she "inten[ds] to establish a parent and child relationship" with the person being adopted, 18–A M.R.S. § 9–303(a)(5) (2008), section 9–303 did not apply to Olive's 1991 adoption of Patricia. Neither former section 531, nor any other statute existing at the time, contained any prohibition or limitation on adoption based on the nature of the pre-existing relationship between the petitioner and the adoptee. In challenging the adoption on public policy grounds, the trustees have the burden to establish that the adoption was contrary to public policy in 1991. Given the significant amount of time—eighteen years—that has passed since the adoption, and in view of the language of the then-existing statute itself, the trustees have not met that burden. Moreover, Patricia herself opposes the annulment, and because there is no provision for allowing annulment of adoptions based on public policy reasons alone, we decline to annul the adoption on public policy grounds.

[¶ 26] The judgment of the Probate Court is vacated and the matter is remanded for entry of a judgment in favor of Patricia.

The entry is:

Judgment vacated and remanded for the entry of a judgment in favor of Patricia S.