MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:       2023 ME 67
Docket:         Yor-23-80
Argued:         October 5, 2023
Decided:        November 7, 2023

Panel:          STANFILL, C.J., and MEAD, JABAR, HORTON, and CONNORS, JJ.

ODIORNE LANE SOLAR, LLC, et al.

v.

TOWN OF ELIOT et al.

CONNORS, J.

[¶1]  The question presented is whether a large solar array project constitutes a "public utility facility" within the meaning of the Town of Eliot's Zoning Ordinance.  Because we conclude that the project does not fit the Ordinance's plain language definition, we vacate the judgment of the Superior Court (York County, *Douglas, J.*) with instructions to reinstate the decision of the Town's Board of Appeals vacating the Planning Board's approval of the application for a permit for the project.

## I.  BACKGROUND

[¶2]  Odiorne Lane Solar, LLC[1] applied to the Planning Board in the spring

---

[1]  NHSOLARGARDEN.COM, LLC was Odiorne's co-applicant for this project.  We refer to the applicants collectively as Odiorne.

2

of 2021 for site-plan review and change-of-use approval to build a large solar array project on land located in the Town's Rural District.[2]  Eliot, Me. Code § 45-402 (June 12, 2021).  The lot on which the project was to be located comprises approximately seventy acres, with approximately eleven of those acres to be developed.  The project consists of a large array of ground-mounted solar panels capable of generating two megawatts of power.  Odiorne posited that the large solar array use was a permitted use within the district because "public utility facilities" are allowed within every district.  Town of Eliot, Me. Code § 45-290 (Nov. 2, 2021).

[¶3]  The Planning Board approved the application.  Abutters appealed that approval to the Board of Appeals, which sustained the appeal, vacating the approval of the Planning Board.  Odiorne appealed that decision to the Superior Court pursuant to M.R. Civ. P. 80B, and the court vacated the decision of the Board of Appeals.  One of the abutters, Jay Meyer, timely appealed to us from the decision of Superior Court.  *See* M.R. App. P. 2B(c)(1); 14 M.R.S. § 1851 (2023).

---

[2] The lot on which the array would be built is partially within a shoreland and resource-protection overlay zone, but the portions of property to be developed do not fall within the overlay zone.

## II.  DISCUSSION

### A.    We review the decision of the Planning Board de novo.

[¶4]  "In a Rule 80B appeal, the Superior Court acts in an appellate capacity, and, therefore, we review the agency's decision directly." *21 Seabran, LLC v. Town of Naples*, 2017 ME 3, ¶ 9, 153 A.3d 113 (quotation marks omitted). The administrative decision on review here is that of the Planning Board because the Eliot Board of Appeals acts only in an appellate capacity in this context.  *See* Eliot, Me. Code § 45-49 (June 8, 2021); *Mills v. Town of Eliot*, 2008 ME 134, ¶¶ 13-16, 955 A.2d 258.

[¶5]  The determinative question in this appeal is whether the array constitutes a "public utility facility" within the meaning of the Ordinance.[3]  With respect to the characterization of a use, we have explained that

> [w]hen there is no ambiguity in the language of the ordinance, we ordinarily review a Board's characterization of a structure as a finding of fact, giving deference to the Board's ultimate conclusion. . . . Interpretations of municipal ordinances, however, are questions of law subject to *de novo* review. . . . Thus, we review the interpretation of the ordinance *de novo*, but we afford the Board's ultimate characterization of the structure substantial deference.

---

[3]  Meyer also argued that that the project does not meet the Ordinance's back-lot requirements. Given our ruling, we need not and do not address this issue.

4

*Jordan v. City of Ellsworth*, 2003 ME 82, ¶¶ 8-9, 828 A.2d 768.  Here, the dispute focuses on the meaning of the text of the Ordinance, as opposed to whether the bundle of factual characteristics of the project fit an unambiguous ordinance definition.  Therefore, the question is subject to our de novo review.

[¶6]  Finally, "[w]e examine an ordinance for its plain meaning and construe its terms reasonably in light of the purposes and objectives of the ordinance and its general structure.  If an ordinance is clear on its face we will look no further than its plain meaning."  *Town of Minot v. Starbird*, 2012 ME 25, ¶ 14, 39 A.3d 897 (citations and quotation marks omitted).

**B.     The solar array project is not a "public utility facility" within the meaning of the Ordinance.**

[¶7]  The Ordinance does not define "public utility facility."  It defines "public utility" as "any person, firm, corporation, municipal department, board or commission *authorized to furnish* gas, steam, *electricity*, waste disposal, transportation or water *to the public*."  Eliot, Me. Code § 1-2 (Nov. 2, 2021) (emphasis added).

[¶8]  To furnish electricity to the public in Maine, an entity must be authorized to do so by the Public Utilities Commission pursuant to Title 35-A. As the electricity market is structured in Maine, solar arrays are not public utilities authorized to furnish electricity to the public.  *See* 35-A M.R.S.

§§ 2101-2102 (2020)[4] (providing that only public utilities allowed within a service territory may "furnish" services, and listing as electric public utilities only transmission and delivery, not generation).

[¶9]  Odiorne admits that it is not a public utility within the meaning of Title 35-A.  *See* 35-A M.R.S. § 102(13) (2020).  In 1999 and 2000, the Legislature restructured the electricity market so that the owners and operators of the transmission and distribution (T&D) network are public utilities, while generators are not.  35-A M.R.S. § 3202 (2020).  Indeed, there is a strict separation between T&D utilities and non-utility generation; T&D utilities are prohibited from owning a generating plant.  *See Competitive Energy Servs. LLC v. Pub. Utilities Comm'n*, 2003 ME 12, ¶ 1, 818 A.2d 1039; *Cent. Me. Power Co. v. Pub. Utilities Comm'n*, 2014 ME 56, ¶ 2, 90 A.3d 451.[5]

---

[4]  All citations to Title 35-A refer to the 2020 version because that was the version that applied when Odiorne applied to the Planning Board, and some sections of Title 35-A have been amended since the 2020 statute took effect, though not in any way relevant to the present case.

[5]  The reasoning behind this separation is that the entities that transmit and distribute electricity should be regulated as public utilities because they are monopolies that serve the public, requiring comprehensive regulatory oversight.  In contrast, generators compete to provide a commodity. *See Competitive Energy Servs. LLC v. Pub. Utilities Comm'n*, 2003 ME 12, 818 A.2d 1039; *GRIDSOLAR, LLC*, Petition for Finding of Public Convenience and Necessity and Related Approvals for the GridSolar Transmission Reliability Project, No. 2009-00152, Order (Me. P.U.C., Dec. 31, 2009) (stating that the delivery of electricity or transmission and distribution service is a utility service, but generation is not), citing, inter alia, *Cent. Me. Power Co.*, Request for Approval of Location of Easements by Eminent Domain over Six Parcels of Land in Oxford County, No. 1999-00467, Order (Me. P.U.C., Sept. 29, 1999) (distinguishing generation plant from T&D facilities).

[¶10]  Instead of being a component of a public utility transmission and distribution network, this solar array would be classified by statute as a non-utility "distributed generation resource," defined as "an electric generating facility with a nameplate capacity of less than 5 megawatts that uses a renewable fuel or technology under section 3210, subsection 2, paragraph B-3 and is located in the service territory of a transmission and distribution utility in the State."  35-A M.R.S. § 3481(5) (2020).  This definition gives this type of generation certain favorable treatment regarding "net billing" and certain other advantages.  *See* 35-A M.R.S. §§ 3209-A, 3482 (2020).[6]  But being registered as a distributed generation resource does not make a generator a public utility.

[¶11]  As a factual matter, this solar array would not sell its generated electricity to the public.  Rather, it would connect its generation plant to the network of Central Maine Power Company, the T&D utility authorized to serve the public in Eliot.  CMP would then deploy the electricity generated from the

---

[6] When Odiorne applied to the Town Board, the superseded versions of sections 3209-A and 3482 cited above applied.  Section 3209-A has since been amended to add subsections pertaining to consumer protection, enforcement, applicability, and unused kilowatt-hour credits.  *See, e.g.*, P.L. 2021, ch. 705, § 13 (effective Aug. 8, 2022) (codified at 35-A M.R.S. § 3209-A (2023)); 35-A M.R.S. § 3209-A (2023) (codifying multiple amendments). Section 3482 has since been amended to prohibit the Commission from "procur[ing] distributed generation resources in the shared distributed generation and commercial or institutional distributed generation market segments using the targets and procurement methods described in this chapter."  *See* P.L. 2021, ch. 390, § 3 (effective Oct. 18, 2021) (codified at  35-A M.R.S. § 3482(1) (2023)).

solar array, as well as a host of other generators, throughout the region to serve its retail customers.

[¶12] Odiorne is correct that some approvals from the Commission are required for large solar arrays and that some solar generators have subscribers, but these arguments are not helpful to either its cause or its position. Nothing in the record indicates that this solar array has subscribers, and generators—solar or otherwise—are not authorized to be a public utility.[7]

[¶13] Odiorne argues that Title 35-A is irrelevant because the issue here is how the Town defines a public utility facility, not how the Legislature has done so. Municipalities are free to define a public utility or public utility facility differently than the Legislature does, but here, the Ordinance specifically defines a public utility as an entity "authorized" to furnish electricity to the

---

[7] In its first presentation before the Planning Board, Odiorne mentioned that there was a program created by the Legislature to incentivize individuals to purchase power from projects like this solar array, but there is no further mention of this program in the record, so it appears that Odiorne did not participate in this program. In any event, this reference appears to relate to a state program through which the State encourages development of distributed generation. *See* 35-A M.R.S. §§ 3484-3487 (2020); 65-407 C.M.R. ch. 312 (effective Dec. 29, 2019). Under this program, the State procures power from participating generators through competitive solicitation. There are two types of generators that can participate in this program, a "shared distributed generation resource on behalf of subscribers" or a "commercial or institutional distributed generation resource." 35-A M.R.S. § 3481(14) (2020). The solar array here appears to fall into the latter category. But it would make no difference if the solar array were the first type of resource. As to either type, the State, through the Commission, still buys the power; the generator is not a public utility; and a subscriber remains a customer of the T&D utility. *See* 35-A M.R.S. §§ 3484, 3485(3), 3486(4). A subscriber can either own or be allocated generation from the resource, and when the T&D utility bills its retail customers who are subscribers to that resource, the power generated by that resource is, as an accounting measure, attributed to the resource for pricing purposes. *See* 35-A M.R.S. §§ 3481(18), 3487(2) (2020).

8

public. Whether an applicant may furnish service to the public is a function of state law, and Title 35-A reflects that Odiorne, like other generators, would not furnish electricity to the public because it is not authorized to do so.

[¶14]  To interpret the Ordinance to include generation within the definition of a public utility would also produce absurd results. *See Jordan*, 2003 ME 82, ¶ 10, 828 A.2d 768 ("A court's interpretation of an ordinance must not create absurd, inconsistent, unreasonable or illogical results.") (quotation marks omitted).  Such inclusion could result in large industrial biomass, natural gas, or nuclear plants being located anywhere in the Town, including the Rural District.  It would also ignore the logical reason why the Ordinance allows public utility facilities in every district—to ensure that the heavily regulated monopoly T&D electricity network can be deployed throughout the municipality.

[¶15]  Finally, the Ordinance provides that any use not listed is prohibited.  Eliot, Me. Code § 45-290 (Nov. 2, 2021).  Although the Ordinance specifically addresses "solar energy systems," this solar array does not fit that definition, Eliot, Me. Code § 1-2 (Nov. 2, 2021), supporting the conclusion that the larger system was not intended to be a permitted use.  *See In re Scates*,

94 Me. 579, 580, 48 A. 113, 113 (1901) (applying the maxims "noscitur a sociis"

and "ejusdem generis").[8]

[¶16]  In sum, under the plain language of the Ordinance, "public utility

facility" means a facility of a public utility authorized to furnish service to the

public.  The solar array does not meet this definition.[9]

### III.  CONCLUSION

[¶17]  Whether the location of solar arrays in rural districts is a good idea

as a matter of policy is not the question before us.  It is up to the voters in the

Town of Eliot to decide what uses may be allowed, reflected in the language

they adopt in their ordinances.  Given the language they chose to define the

permitted use of public utility facilities, we agree with the Board of Appeals

---

[8]  The Ordinance also allows, with the approval of the code enforcement officer, "[u]ses similar to uses requiring a planning board permit." Eliot, Me. Code § 45-290 (Nov. 2, 2021).  But we can base our review only on the ground upon which the Planning Board made its decision, and it did not base its decision on confirmation of the conclusion of the code enforcement officer that a large solar array was similar to a use permitted in the Rural District.  Any similarity to a "solar energy system" would not help Odiorne here either because such systems "are allowed only as accessory uses," suggesting that a large-scale, stand-alone array would *not* be deemed similar and therefore would not be allowed.  Eliot, Me. Code § 1-2 (Nov. 2, 2021).

[9]  In their briefs and at oral argument, the parties alluded to an amendment to the Ordinance that may expressly allow large solar arrays in the Rural District.  But no one has submitted the amended language to us, and as we have stated repeatedly, we cannot take judicial notice of ordinance language. *Mills v. Town of Eliot*, 2008 ME 134, ¶ 23, 955 A.2d 258; *Summit Realty, Inc. v. Gipe*, 315 A.2d 428, 429-30 (Me. 1974) ("We have consistently held that the existence of municipal ordinances must be proved and that they are not subject to judicial notice.").  Hence, we cannot consider whether any such amendment was intended to clarify or change the existing Ordinance language, and we do not know what conditions, if any, attach to this purported permission.

that, at the relevant times for this application, the Ordinance did not permit the location of the project within the Rural District.

The entry is:

> Judgment vacated. Remanded to the Superior Court with instructions to enter a judgment affirming the decision of the Board of Appeals.

―――――――――――――――――

Patrick S. Bedard, Esq. (orally), Bedard & Bobrow, P.C., Eliot, for appellant Jay Meyer

Leah B. Rachin, Esq. (orally), and Amy K. Olfene, Esq., Drummond Woodsum, Portland, for appellee Odiorne Lane Solar, LLC, and NHSOLARGARDEN.COM, LLC

Sandra L. Guay, Esq. (orally), Archipelago Law, LLP, Portland, for appellee Town of Eliot

York County Superior Court docket number AP-2022-9
FOR CLERK REFERENCE ONLY