STATE OF MAINE
CUMBERLAND, ss.

BUSINESS AND CONSUMER COURT
Location: Portland
Docket No. BCD-WB-AP-11-06

ANTHEM HEALTH PLANS OF
MAINE, INC. d/b/a ANTHEM BLUE
CROSS AND BLUE SHIELD,

      Petitioner,

    v.

SUPERINTENDENT OF INSURANCE,

      Respondent/
      Defendant,

ATTORNEY GENERAL OF THE
STATE OF MAINE,

      Party-in-Interest/
      Defendant,

and CONSUMERS FOR AFFORDABLE
HEALTH CARE,

      Party-in-Interest

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

DECISION ON 80C APPEAL AND
ORDERS ON MOTIONS TO DISMISS AND
MOTION FOR SUMMARY JUDGMENT

Entered on the Docket: 8·29·11
Copies sent via Mail ___ Electronically ✓

Before the court is the three–count petition of Petitioner Anthem Health Plans of Maine, Inc. (hereinafter "Anthem" or "Petitioner"). Count I is an 80C Appeal from the Decision and Order of Respondent Superintendent of Insurance (hereinafter "Superintendent" or "Respondent") dated May 18, 2011, setting the 2011 rate for individual health insurance products. Count II is an independent claim alleging a violation of due process and a taking without just compensation; and Count III seeks a declaratory judgment, pursuant to 14 M.R.S. §§ 5951-63 (2010), that 24-A M.R.S. § 2736 (2010) requires that regulated insurance rates must be designed to include a fair and reasonable rate of return.

The Superintendent, the Attorney General, and Consumers for Affordable Health Care ("Consumers"), have each filed a motion to dismiss the independent claims in Counts II and III, asserting 12(b)(1), 12(b)(6), and 12(c) as grounds. Petitioner filed a motion for summary judgment as to Counts II and III; the court stayed briefing on that motion pending determinations of the administrative appeal and the motions to dismiss. However, based upon the within decisions on those motions and the appeal, the motion for summary judgment may also be disposed of at this time.

The court will first address the various motions to dismiss Counts II and III, and then turn to the merits of Anthem's administrative appeal.

I.      MOTIONS TO DISMISS

        A.      Factual And Procedural Background[1]

The Maine Insurance Code (the "Code") requires that insurance carriers doing business in the State submit proposed premium rates for individual insurance products to the Superintendent for review and approval. 24-A M.R.S. § 2736. Specifically, section 2736(1) provides that "[e]very insurer shall file with the superintendent every rate, rating formula, classification of risks and every modification of any formula or classification that it proposes to use in connection with individual health insurance policies." 24-A M.R.S. § 2736(1). The Superintendent must then review the filing "to determine whether [it] meets the requirements that rates not be excessive, inadequate or unfairly discriminatory . . . ." 24-A M.R.S. § 2736(2).

Until 2009, the Superintendent in each year's rate proceeding approved at least a 3% pre-tax profit margin for Anthem's individual insurance products. (Petition ¶ 13.) In 2009, the Superintendent approved rates that eliminated any margin for risk or profit, setting the profit margin at 0%. (Petition ¶ 14.) The Superintendent's view was that rates are adequate so long as

_____

[1] The facts in this section are drawn from Anthem's petition.

2

they would not result in the insolvency of the insurance carrier.[2] (Petition ¶ 14.) In 2010, the Superintendent approved rates for the individual insurance products with a margin of 0.5% on the same reasoning as the 2009 rates. (Petition ¶ 15.)

In 2011, Anthem filed its proposed rates for its individual insurance products, HealthChoice, HMO, and Lumenos, with the Superintendent; the filing included a 3% pre-tax risk and profit margin. (Petition ¶ 21.) Consumers and the Attorney General were parties-in-interest at the hearing on Anthem's rates in April 2011. After the hearing, the Superintendent approved rates that contemplated a 1% margin for risk and profit, maintaining her view that under section 2736(2) insurance rates do not require a fair and reasonable rate of return and that rates need only not "threaten the company's or enterprise's financial integrity." (Petition ¶¶ 23-25.) The Superintendent approved Anthem's compliance filing on May 18, 2011. (Petition ¶ 26.) On June 10, 2011, Anthem filed this 80C appeal and independent claims in the Kennebec Superior Court. The matter was transferred the Business and Consumer Court on June 21, 2011.

B. Discussion

The Superintendent, the Attorney General, and Consumers have each filed a motion to dismiss Counts II and III, asserting Rules 12(b)(1) and 12(b)(6) as grounds. The Superintendent, joined by the Attorney General,[3] and Consumers make two basic arguments. First, because the Legislature has provided Anthem with a direct and adequate means of review for the Superintendent's decision, that remedy is intended to be exclusive and Anthem cannot seek collateral judicial review of the decision with a declaratory judgment action. (Resp.'s M.

---

[2] This court affirmed the Superintendent's decision in *Anthem Health Plans of Maine, Inc. v. Superintendent of Insurance*, BCD-WB-AP-09-36 (Me. Super. Ct. Apr. 21, 2010). On Anthem's appeal of that decision, The Law Court dismissed the case as moot. *See Anthem Health Plans of Maine, Inc. v. Superintendent of Insurance*, 2011 ME 48, ¶ 14, 18 A.3d 824, 828.

[3] The Attorney General joins in the arguments made by the Superintendent in her brief. (AG's M. Dismiss 3.)

Dismiss 3-8; Consumers' M. Dismiss 3-4.) Second, because any decision on the declaratory judgment action would not terminate the controversy between the parties, Anthem is seeking an advisory opinion and the court should exercise its discretion and decline not to issue any judgment. *See* 14 M.R.S. § 5958 (2010). (Resp.'s M. Dismiss 8-10; Consumers' M. Dismiss 4-5.)

In addition, the Attorney General seeks dismissal of claims against him in his official capacity pursuant to M.R. Civ. P. 12(c) and M.R. Civ. P. 80C(i) because: Anthem has alleged no harm by the Attorney General; no relief can be granted against the Attorney General; and the Attorney General was not involved in the decision-making by the Superintendent of the underlying rate-setting proceeding. (AG's M. Dismiss 3-4.) Anthem opposes the motions.

1.  Standard of Review

A motion to dismiss pursuant to M.R. Civ. P. 12(b)(1) challenges the court's subject matter jurisdiction, which is a question of law. *See Windham Land Trust v. Jeffords*, 2009 ME 29, ¶ 19, 967 A.2d 690, 696. "When a motion to dismiss is based on the . . . lack of subject matter jurisdiction, [the court makes] no favorable inferences in favor of the plaintiff such as . . . when reviewing a motion to dismiss for failure to state a claim upon which relief can be granted." *Tomer v. Me. Human Rights Comm'n*, 2008 ME 190, ¶ 9, 962 A.2d 335, 338.

A motion to dismiss pursuant to both M.R. Civ. P. 12(b)(6) and 12(c) "tests the legal sufficiency of the complaint and, on such a challenge, 'the material allegations of the complaint must be taken as admitted.'" *Shaw v. S. Aroostook Comm. Sch. Dist.*, 683 A.2d 502, 503 (Me. 1996) (quoting *McAfee v. Cole*, 637 A.2d 463, 465 (Me. 1994)); *Camps Newfound/Owatonna Corp. v. Town of Harrison*, 1998 ME 20, ¶ 3, 705 A.2d 1109, 1111 (quoting *Shaw*, 683 A.2d at 503). When reviewing a motion to dismiss, this court examines "the complaint in the light most

4

favorable to the plaintiff to determine whether it sets forth elements of a cause of action or alleges facts that would entitle the plaintiff to relief pursuant to some legal theory." *Shaw*, 683 A.2d at 503. A dismissal under M.R. Civ. P. 12(b)(6) or 12(c) will be granted only "when it appears beyond a doubt that the plaintiff is entitled to no relief under any set of facts that he might prove in support of his claim." *Id.* (quoting *Hall v. Bd. of Envtl. Prot.*, 498 A.2d 260, 266 (Me. 1985)).

### 2. Exclusivity Doctrine

The Superintendent, the Attorney General, and Consumers all contend that the exclusivity doctrine prevents Anthem from asserting a separate declaratory judgment action because the 80C appeal affords Anthem an adequate remedy at law, and that remedy is therefore exclusive. The exclusivity doctrine is stated thusly: "when a legislative body has made provision, by the terms of a statute or an ordinance, for a direct means by which the decision of an administrative body can be reviewed in a manner to afford adequate remedy, such direct avenue is intended to be exclusive." *Fisher v. Dame*, 433 A.2d 366, 372 (Me. 1981); *accord Gagne v. Lewiston Crushed Stone Co.*, 367 A.2 613, 618 (Me. 1976); *Stoddard v. Pub. Utils. Comm'n*, 137 Me. 320, 323, 19 A.2d 427, 428-89 (1941). Collateral judicial review of an agency decision is not available unless the remedy at law is inadequate and will cause irreparable injury. *See Fisher*, 433 A.2d at 372. Collateral judicial review

> is permitted, for example, where the direct appeal is not broad enough in scope to allow judicial review of all the issues the aggrieved party seeks to have judicially considered, *see Lewiston, Greene & Monmouth Tel. Co. v. New Eng. Tel. & Tel. Co.*, 299 A.2d 895, 904 (Me. 1973); or where claim is made that the ordinance under which the administrative agency purported to act was unconstitutional on its face, a contention which, if established, would render the administrative action beyond lawful authority, *Town of Windham v. LaPointe*, 308 A.2d 286 (Me. 1973); or where the case involves a complex course of executive and legislative conduct by municipal officials as to which a remedy is impossible through an

5

appeal to the Zoning Board of Appeals and subsequent direct judicial review, *Walsh v. City of Brewer*, 315 A.2d 200 (Me. 1974).

*Fisher*, 433 A.2d at 374. The exclusivity doctrine applies equally to an invocation of a court's equity jurisdiction as it does to a declaratory judgment action. *See Sold, Inc. v. Town of Gorham*, 2005 ME 24, ¶ 15, 868 A.2d 172, 177; *Capodilupo v. Town of Bristol*, 1999 ME 96, ¶ 4, 730 A.2d 1257, 1258-59. The court must thus examine Anthem's remedy at law and whether it provides Anthem with an adequate remedy.

Anthem's remedy at law from the Superintendent's decision derives from 24-A M.R.S. § 2330 (2010), which states that "[a]ny insurer, advisory organization or rating organization aggrieved by any order or decision of the superintendent may appeal therefrom as provided in section 236." Section 236, in turn, states that "[i]n general, judicial review of actions taken by the superintendent . . . must occur in conformity with the provisions set forth in the Maine Administrative Procedures Act [(APA), 5 M.R.S. §§ 11001-11008 (2010)]." 24-A M.R.S. § 236(1) (2010). Thus, pursuant to the Code and the APA, when an insurer such as Anthem seeks judicial review of an order or decision of the Superintendent, the court may affirm the decision, 5 M.R.S. § 11007(4)(A), remand for further proceedings, 5 M.R.S. § 11007(4)(B), or:

> [r]everse or modify the decision if the administrative findings, inferences, conclusions or decisions are:
>
> (1) In violation of constitutional or statutory provisions;
> (2) In excess of the statutory authority of the agency;
> (3) Made upon unlawful procedure;
> (4) Affected by bias or error of law;
> (5) Unsupported by substantial evidence on the whole record; or
> (6) Arbitrary or capricious or characterized by abuse of discretion.

5 M.R.S. § 11007(4)(C).

In Count I of Anthem's Petition, Anthem alleges that the Superintendent's decision is "in violation of statutory provisions, affected by an error of law, arbitrary or capricious and/or

characterized by an abuse of discretion." (Petition ¶ 29.) In Count II of Anthem's Petition, Anthem alleges that the Superintendent's decision and interpretation of 24-A M.R.S. § 2736 are unconstitutional under the Due Process Clause and Takings Clause of both the United States and Maine Constitutions.[4] (Petition ¶ 34.) In Count III of Anthem's Petition, Anthem seeks a declaration that Superintendent's interpretation of 24-A M.R.S. § 2736 is unconstitutional under the Due Process Clause and Takings Clause of both the United States and Maine Constitutions. (Petition ¶ 44.) It is clear that all of Anthem's assignments of error are within the scope of 5 M.R.S. § 11007(1), (2), (4), and (6), which provide a remedy at law.

Anthem, however, contends that the remedy at law is inadequate because the Superintendent's yearly individual insurance rate determinations render Anthem's yearly appeals moot at the end of the rate term. *See Anthem Health Plans of Me., Inc. v. Superintendent of Ins.,* 2011 ME 48, ¶ 14, 18 A.3d 824, 828 (dismissing as moot Anthem's appeal in the 2009 individual health insurance products ratemaking). The court is not prepared to make that leap. As noted in previous orders in this case, the court, with the cooperation of the other parties, have moved this case forward on expedited review and briefing. Whether or not a controversy is no longer justiciable when it reaches the Law Court does not make the remedy afforded to Anthem by the Legislature inadequate, nor should the possibility of mootness in the future guide this court's determination of the adequacy of judicial review. The court will not evaluate adequacy of remedy on hypotheticals. The Legislature has provided Anthem with an adequate remedy for its grievances with the Superintendent's decision and that remedy is exclusive. *See Fisher*, 433 A.2d at 372.

---

[4] The Superintendent does not object to incorporating Anthem's constitutional challenge into the 80C portion, notwithstanding that Anthem did not allege a constitutional violation specifically in Count I. (Resp.'s M. Dismiss 10-11.) At oral argument on this motion, the court confirmed that there was no objection to wrapping Anthem's constitutional challenges into the 80C appeal.

7

Nevertheless, Anthem contends the court has jurisdiction pursuant to 14 M.R.S. § 5954 because that there is a real controversy over the meaning of 24-A M.R.S. § 2736 and that it could have filed a declaratory judgment action independent of its 80C appeal. (Opp'n M. Dismiss 4-5.) Anthem further contends that its declaratory judgment action is only seeking guidance as to future conduct, and not as a collateral judicial review of the Superintendent's decision. (Opp'n M. Dismiss 5-7.) In support, Anthem relies on *Halfway House, Inc. v. City of Portland*, 670 A.2d 1377 (Me. 1996), *Annable v. Board. of Environmental Protection*, 507 A.2d 592 (Me. 1986), and *King Resources, Inc. v. Environmental Improvement Commission*, 270 A.2d 863 (Me. 1970). Each case is inapposite.

First, although *Halfway House* seems to square with the facts of this case, the issue in *Halfway House* was not whether the plaintiff had an adequate remedy at law; the issue was whether the plaintiff had sufficient *standing* to challenge the constitutionality of a city's zoning ordinance through a declaratory judgment action. *See Halfway House, Inc.*, 670 A.2d at 1380-81. The Law Court did not address the issue presented here regarding exclusivity. Second, a declaratory judgment seeking interpretation of a statute was available to the plaintiff in *Annable* because there had not been any administrative action or inaction by the agency from which he could have appealed. *See Annable*, 507 A.2d at 595-96 (explaining that although the parties disagreed over a statute's interpretation, the agency had not acted on its interpretation). In the present case, the Superintendent *has* acted by approving Anthem's rates for the upcoming year, distinguishing this case from the facts and circumstances in *Annable*. Finally, *King Resources* should be best viewed in the peculiar context of that case, 1) in which the Environmental Improvement Commission had given no notice or hearing to the plaintiff before setting a policy that affected its rights, thus depriving the plaintiff of an adequate remedy at law,

8

and 2) because, by statute, the appeal process was directed to the Supreme Judicial Court. *See King Resources, Inc.*, 270 A.2d at 865-66. The court finds none of the cases applicable to the present circumstances because Anthem's standing is not in issue, the Superintendent has acted, and Anthem's remedy at law is adequate.

C.    Conclusion

Because Anthem has an adequate remedy at law within its administrative appeal, the exclusivity doctrine strips the court of jurisdiction over Counts II and III, and dismissal pursuant to M.R. Civ. P. 12(b)(1) is appropriate. Because the court is dismissing those counts, it does not address the alternative arguments offered by the Superintendent, the Attorney General, or Consumers.

II.    ANTHEM'S 80C APPEAL

Anthem asserts that the Superintendent's decision is "in violation of statutory provisions, affected by an error of law, arbitrary or capricious and/or characterized by an abuse of discretion." (Petition ¶ 29.) In addition, incorporating the constitutional attack into the 80C petition as suggested by the Superintendent in its brief on the motion to dismiss, Anthem contends that Superintendent's decision and interpretation of 24-A M.R.S. § 2736 is unconstitutional under the Due Process Clause and Takings Clause of both the United States and Maine Constitutions because it is a confiscatory taking without just compensation. (Petition ¶ 34.)

A.    Factual And Procedural Background

1.    Rate-Filing Procedures and Administrative Hearing

On January 28, 2011, Anthem filed proposed revised rates for approval for its individual health insurance products, namely its HealthChoice, HealthChoice HDHP, HealthChoice

9

Standard & Basic, HMO Standard and Basic, and Lumenos Consumer Directed Health Plan products. (Record at 16-17 (hereinafter "R. __")[5]). The average requested increase across the individual health insurance products was 9.7%. (R. 197.) On February 7, 2011, March 2, 2011, and March 31, 2011, Anthem filed revisions to its initial filing to correct errors in that initial filing and to provide more updated data and information, but did not amend the average rate increase percentage. (R. 187, 197, 248.)

On February 8, 2011, the Superintendent issued a Preliminary Notice of Filing and Related Procedural Matters. (R. 320-23.) The Preliminary Notice set evening public comment sessions for March 14, 2011, in Orono, and March 22, 2011, in Portland. (R. 321.) On March 1, 2011, the Superintendent issued a Notice of Hearing, setting April 5, 2011, and April 6, 2011, if necessary, as the dates of the public hearing; the Superintendent also identified the Attorney General and Consumers as parties to the proceeding. (R. 324.) The public hearing was rescheduled due to witness availability with the consent of the parties to April 12, 2011, and April 13, 2011, if necessary. (R. 325.) The Superintendent added another night to the public comment sessions in Gardiner for April 11, 2011. (R. 325.) Forty-five members of the public provided sworn testimony at the comment sessions. (R. Vol. IV, Mar. 14, 2011 Tr.; R. Vol. IV, Mar. 22, 2011 Tr. R. Vol. IV, Apr. 11, 2011 Tr.)

The public hearings occurred on April 12 and 13, 2011. (R. Vol. IV, Apr. 12, 2011 Tr.; R. Vol. IV, Apr. 13, 2011 Tr.) Anthem, the Attorney General, and Consumers had filed the pre-filed testimony of their respective witnesses on April 7, 2011. (R. 721-767, 1784-1809, 1932-2564.) The parties filed responses to panel inquiries from the hearing in the days following the public hearing (R. 1615-24, 1810-15, 2565-70), and then filed written closing arguments on

---

[5] The first 2631 pages of the record are numbered sequentially, and include all the administrative filings and notices except for the hearing transcripts and consumer letters. The court refers to the first 2631 pages by their page number, and the remaining part of the record by volume, date (if applicable), and page number.

April 22, 2011 (R. 805-13, 1816-24, 2608-15). Anthem filed three more supplemental responses to requests from the Superintendent between April 29, 2011, and May 11, 2011. (R. 1625-1749.) The Superintendent issued her decision on May 12, 2011 (R. 375-424), and approved the compliance rates submitted by Anthem by order dated May 18, 2011, which order also incorporated the May 12, 2011, decision (R. 425-26).

2.    Superintendent's Decision

Because Anthem limits its challenges to a discrete portion of the Superintendent's decision, the court only recounts the portions of the decision that are relevant to Anthem's appeal. As noted, the proposed average rate increase in Anthem's filing was 9.7%.[6] (R. 197, 376.) The Superintendent concluded that the rates were "not inadequate," but were "excessive and unfairly discriminatory in contravention of section 2736." (R. 382.)

As part of its filing, Anthem proposed a 3% pre-tax risk and profit margin, which is the margin approved by the Superintendent prior to 2009.[7] (R. 409.) The Superintendent noted that Anthem had consistently argued that individual health insurance rates must be designed to include a fair and reasonable rate of return, but described her analysis thusly:

> Whether and to what extent Maine law *requires* regulated individual health insurance rates to include a projected profit margin as Anthem maintains, the Superintendent's determination of what is an approvable rate for a one-year period (including what, if any, built-in expected profit to provide) involves a balancing of investor and consumer interest. In other words, the *amount* at which to approve a built-in expected profit in regulated rates, if any, must balance the need for a rate not to threaten the company's or enterprise's financial integrity against the legitimate governmental interests of protecting the viability of the insurance pool, keeping insurance premiums as reasonable as possible, and

---

[6] This rate included a 2.5% pre-tax risk and profit margin. (R. 758.) It appears that at the start of the hearing, Anthem modified the proposed average rate increase to 9.2%, but that rate included a 3% pre-tax risk and profit margin. (R. 1744.)

[7] In 2009, the Commissioner approved a 0.0% profit and risk margin; in 2010, the Commissioner approved a 0.5% profit and risk margin. (R. 409-10.)

minimizing adverse-selection. There is no bright-line test. The analysis involves a factual inquiry based on the evidence in the record at the time of the rate review.

(R. 410-11 (footnote omitted); *see* R. 411-15 (constituting the Superintendent's analysis of the competing interests).)

Based on the evidence in the record, the Superintendent found that between 1999 and 2010, Anthem's individual health insurance business in Maine has achieved a positive profit margin of 2.1%. (R. 411, 414.) In 2010, "Anthem's pre-tax profit from the individual product line was 2.5%, or a gain of over $1.5 millions." (R. 414.) The profits from Anthem's individual business in Maine has helped fund Anthem's surplus, which is a company-wide, common surplus fund for all of Anthem's business lines that is available to meet the corporations financial obligations and pay shareholder dividends. (R. 413.) The surplus fund has increased from $209,500,000 in 2009 to $229,100,000 in 2010, and, over the past four years, Anthem has paid nearly $185 million in dividends. (R. 413.)

The Superintendent also considered the sworn testimony of 40 Anthem policyholders, who testified to "the continuing financial hardships they face due to the economic downturn, the severe impacts annual rate increase have on their budgets, and their corresponding ability (or inability) to stay insured." (R. 414-15.) The Superintendent also noted the legitimate state interests considered in the rate-setting process: "the need to keep premiums as low and affordable as possible, and the concern that rising rates have caused adverse selection in Anthem's individual insurance business." (R. 415.)

Balancing the competing interests of the insureds, public policy, and Anthem's financial integrity, the Superintendent concluded that a built-in 3% risk and profit margin would contribute to making the proposed 9.7% requested rate increase excessive. *See* 24-A M.R.S. § 2736. (R. 415.) The Superintendent concluded that a 1% built-in risk and profit margin,

12

resulting in a 5.2% average rate increase would be approvable. (R. 415-16.) Anthem submitted an updated proposal to comply with the Superintendent's decision, which the Superintendent approved on May 18, 2011. (R. 308-319, 425-26.)

B.    Discussion

The court has the benefit of the well-briefed and well-argued positions of all the parties in this proceeding. Fundamentally, the parties disagree over what interest the "not . . . inadequate" criteria in section 2736 is intended to protect. Anthem contends that it is intended to protect insurers by ensuring that the approved rate provides a fair and reasonable rate of return. In support, Anthem cites both the rules of statutory construction and the Maine and United States Constitution. The Superintendent[8], on the other hand, maintains that the "not . . . inadequate" criteria is intended to protect policyholders from the possibility that an insurer would charge rates that are too low, causing the insurer to become insolvent and thus unable to meets its obligations to policyholders. The parties also disagree over the constitutional implications of ratemaking and how that limits the Superintendent's discretion to set rates. Finally, Anthem avers that the Superintendent impermissibly considered Anthem's overall financial health resulting in an unlawful cross-subsidization of Anthem's individual products by the rest of their business lines.

The court will first address the statutory requirements of section 2736, then cross-subsidization, and then how the mandates of the United States and Maine Constitutions affect the decision–making of the Superintendent.

---

[8]  The Superintendent and Attorney General filed a joint brief. For brevity the court refers only to the Respondent Superintendent.

13

1.    Standard of Review

In an appeal of final agency action brought pursuant to M.R. Civ. P. 80C, this court reviews "the agency's decision for errors of law, abuse of discretion, or findings not supported by substantial evidence in the record." *Beauchene v. Dep't of Health & Human Servs.*, 2009 ME 24, ¶ 11, 965 A.2d 866, 870 (quotation marks omitted); *see also Seider v. Bd. of Exam'rs of Psychologists*, 2000 ME 206, ¶ 8, 762 A.2d 551, 555. As noted earlier, in an 80C appeal of an agency's decision, the court may affirm the decision, 5 M.R.S. § 11007(4)(A), remand for further proceedings, 5 M.R.S. § 11007(4)(B), or:

> [r]everse or modify the decision if the administrative findings, inferences, conclusions or decisions are:
> (1)   In violation of constitutional or statutory provisions;
> (2)   In excess of the statutory authority of the agency;
> (3)   Made upon unlawful procedure;
> (4)   Affected by bias or error of law;
> (5)   Unsupported by substantial evidence on the whole record; or
> (6)   Arbitrary or capricious or characterized by abuse of discretion.

5 M.R.S. § 11007(4)(C).

When reviewing "an agency's interpretation of a statute that is both administered by the agency and within the agency's expertise, [courts] apply a two-part inquiry." *Dep't of Corr. v. Pub. Utils. Comm'n*, 2009 ME 40, ¶ 8, 968 A.2d 1047, 1050 (*quoting Competitive Energy Servs. LLC v. Pub. Utils. Comm'n*, 2003 ME 12, ¶ 15, 818 A.2d 1039, 1046). The "first inquiry is to determine de novo whether the statute is ambiguous. An ambiguous statute has language that is reasonably susceptible of different interpretations." *Id.* (citations and quotation marks omitted). Second, the court either reviews the agency's "construction of the ambiguous statute for reasonableness or plainly construe[s] the unambiguous statute." *Id.* "On questions involving the interpretation and application of technical statutes or regulations, this court gives deference to the administrative agency unless the statutes or regulations plainly compel a contrary result."

14

*Imagineering, Inc. v. Superintendent of Ins.*, 593 A.2d 1050, 1053 (Me. 1991); *see also Dep't of Corr.*, 2009 ME 40, ¶ 8, 968 A.2d at 1050 (explaining that a court will accord great deference to an agency's interpretation of an ambiguous statue, but not if the statute plainly compels a contrary result).

### 2. The Mandates of Section 2736

Anthem first contends that the rules of statutory construction mandate its interpretation of section 2736. (Pet.'s Br. 7-9.) Section 2736(1) provides that "[e]very insurer shall file with the superintendent every rate, rating formula, classification of risks and every modification of any formula or classification that it proposes to use in connection with individual health insurance policies." 24-A M.R.S. § 2736(1). The Superintendent then reviews the filing "to determine whether such filing meets the requirements that rates not be excessive, inadequate or unfairly discriminatory . . . ." 24-A M.R.S. § 2736(2). The terms "excessive," "inadequate," and "unfairly discriminatory" are undefined in the statute.

Anthem avers that the terms "excessive" and "inadequate," when viewed within the context of the statutory scheme, mean that the rates set by the Superintendent must be "not so high that they are excessive with respect to customers, and not so low that they are inadequate to provide a fair an reasonable rate of return to insurers." (Pet.'s Br. 7.) Anthem points to numerous other states with similar statutes that interpret "not . . . inadequate" to safeguard a fair and reasonable rate of return. *See, e.g., Calfarm Ins. Co. v. Deukmejian*, 771 P.2d 1247 1256-57 (Cal. 1989); *cf.* CAL. INS. CODE § 12739.54(a) (Deering, LEXIS through 2011 Sess.) ("Plan rates for high risk medical benefits approved for the program shall not be excessive, inadequate, or unfairly discriminatory, but shall be adequate to pay anticipated costs of claims or services and administration.") The Superintendent contends that section 2736 is a restriction on the rates that

15

the insurer can charge to protect policyholders, and that "not . . . inadequate" means a rate that will protect the consumer by ensuring the insurer's solvency and ability to pay out claims. *Cf.* 24-A M.R.S. § 2382(3). (Resp.'s Br. 18-19.)

The threshold question here, as in any case involving statutory construction, is whether the statute is ambiguous. *Dep't of Corr.*, 2009 ME 40, ¶ 8, 968 A.2d at 1050. A statute is ambiguous when it is *reasonably* susceptible of different interpretations. *See id.* Although this court had previously held that the statute was not ambiguous, *see Anthem Health Plans of Maine, Inc. v. Superintendent of Insurance*, BCD-WB-AP-09-36, at 11 (Me. Super. Ct. Apr. 21, 2010), dicta in the Law Court's decision in that case on appeal suggests otherwise: "the Legislature could *eliminate the ambiguity that has given rise to this appeal* through the simple insertion of the definition of the phrase 'not . . . inadequate.'" *Anthem Health Plans of Me., Inc.*, 2011 ME 48, ¶ 12, 18 A.3d at 828 (emphasis added). In light of the inference that this court draws from the Law Court's language in that decision, the lack of an express statutory definition of "not . . . inadequate" in Maine's Insurance Code, together with a determination that neither Anthem's nor the Superintendent's contrary interpretations of the phrase are patently unreasonable, the court now concludes the statute is ambiguous.[10]

The court accords great deference to the Superintendent's interpretation of technical statutes within her realm of expertise when those statutes are considered ambiguous. *See Dep't. of Corr.*, 2009 ME 40, ¶ 8, 968 A.2d at 1050; *Imagineering, Inc.*, 593 A.2d at 1053. The court will defer to that interpretation unless the statute plainly compels a contrary result. *See Dep't. of*

---

[10] "Adequacy", as that term is typically used, relates to whether something is "satisfactory" or "sufficient." *See* http://www.merriam-webster.com/dictionary/adequate (defining "adequate" to mean, inter alia, "sufficient for a specific requirement," "barely sufficient or satisfactory" and "lawfully and reasonably sufficient for a specific requirement") (last visited August 24, 2011). In a definitional sense, the meaning of that word is not unclear or controversial. However, as this court has previously noted, "adequacy" and "inadequacy" are relative terms and necessarily require reference or comparison to some other factor. *See Anthem Health Plans of Maine, Inc*, BCD-WB-AP-09-36, at 11. That is, the question of whether something is "adequate" or "inadequate" necessarily begs a follow-up inquiry, namely "adequate or inadequate as to what?"

16

*Corr.*, 2009 ME 40, ¶ 8, 968 A.2d at 1050. In this case, the Superintendent has interpreted section 2736 as a restriction on the rates that the insurer can charge to protect policyholders, and "not . . . inadequate" means a rate that will protect the consumer by ensuring the insurer's solvency and ability to pay out claims.[12] In other words, a rate is "not . . . inadequate" if it is not so low as to threaten the insurer's solvency. Anthem contends that the Superintendent's interpretation means there is no protection for insurers like Anthem within the statute.

The court disagrees with Anthem and finds nothing in language of section 2736 or the Maine Insurance Code that undermines the deference to be accorded the Superintendent's interpretation or that otherwise compels a contrary result, and thus the interpretation of the Superintendent is controlling in this situation.[13] As will be discussed, all ratemaking is subject to

---

[12] In full, section 2736 provides:

### § 2736. Rate filings on individual health insurance policies

**1. Filing of rate information.** Every insurer shall file for approval by the superintendent every rate, rating formula, classification of risks and every modification of any formula or classification that it proposes to use in connection with individual health insurance policies and certain group policies specified in section 2701. If the filing applies to individual health plans as defined in section 2736-C, the insurer shall simultaneously file a copy with the Attorney General. Every such filing must state the effective date of the filing. Every such filing must be made not less than 60 days in advance of the stated effective date, unless the 60-day requirement is waived by the superintendent, and the effective date may be suspended by the superintendent for a period of time not to exceed 30 days. A filing required under this section must be made electronically in a format required by the superintendent unless exempted by rule adopted by the superintendent. Rules adopted pursuant to this subsection are routine technical rules as defined in Title 5, chapter 375, subchapter 2-A.

**2. Filing; information.** When a filing is not accompanied by the information upon which the insurer supports such filing, or the superintendent does not have sufficient information to determine whether such filing meets the requirements that rates not be excessive, inadequate or unfairly discriminatory, the superintendent shall require the insurer to furnish the information upon which it supports the filing. A filing and all supporting information, except for protected health information required to be kept confidential by state or federal statute and descriptions of the amount and terms or conditions or reimbursement in a contract between an insurer and a 3rd party, are public records notwithstanding Title 1, section 402, subsection 3, paragraph B and become part of the official record of any hearing held pursuant to section 2736-A.

24-A M.R.S. § 2736.

[13] Although Anthem argues that the Superintendent changed her interpretation of "not . . . inadequate" beginning with the 2009 proceeding, the Superintendent's current position is consistent with a 2001 bulletin: "Maine law

17

the requirements of the United States and Maine Constitutions, and those constitutional protections do not necessarily coincide with statutory minimums and maximums.

Although there has been a tendency in the briefs to conflate the statutory mandates with constitutional mandates, the court views the inquiries as separate and distinct from one another. The court is satisfied that the Superintendent's interpretation of section 2736 as a limit on insurers and for the protection of consumers is correct. Because Anthem has not challenged the Superintendent's factual findings or application of the solvency standard to those factual findings, the court concludes that the Superintendent committed no error of law or statutory violation in her interpretation and application of section 2736 to Anthem's rate filing. *See* 5 M.R.S. § 11007(4)(C).

### 3. Cross-Subsidization

Anthem also contends that the Superintendent impermissibly considered Anthem's overall financial health in setting the 2011 rates because the Superintendent used it as a surrogate for financial health. (Pet.'s Br. 15.) Anthem avers this is error for two reasons: 1) the Insurance code requires the Superintendent to consider rates only in the context of the financial performance and health of that line of business of the insurance carrier, and 2) rate-making principles prohibit rate designs based on cross subsidization and "consideration of financial returns from products not subject to rate regulation and products sold in non-domestic business." (Pet.'s Br. 15-23.)

---

requires the Superintendent to allow the [rate] increase [of medical coverage under individual policies] *if it is found to be adequate to pay anticipated claims* and is found not to be excessive or unfairly discriminatory." Me. Superintendent of Ins., Bulletin 311, Individual Medical Insurance: Notice of Rate Increases and Right to Request Hearing (Sept. 28, 2001), *available at* http://www.state.me.us/pfr/insurance/bulletins/311.htm (emphasis added).

### a. The Requirements of the Maine Insurance Code

Anthem contends that because the Maine Insurance Code distinguishes between individual and group insurance products for rate-setting purposes, the Superintendent is precluded from analyzing the adequacy of individual rates by considering profits derived from group products. Anthem notes that pursuant to 24-A M.R.S. § 2701 (2010), "any group or blanket policy," with certain exceptions, is not subject to the provisions of section 2736. In support, Anthem relies on an automobile insurance case from Massachusetts, *Aetna Casualty & Surety Co. v. Commissioner of Insurance*, 263 N.E.2d 698 (Mass. 1970). In *Aetna Casualty*, the Massachusetts Legislature enacted a law that reduced the rates that insurers could charge for property damage liability auto insurance by 15% for the year 1971. *Id.* at 699. The previous rates had already generated an aggregate loss for Massachusetts insurers, and the loss the insurers stood to underwrite under the statute was even greater. *Id.* at 700. The Massachusetts Supreme Judicial Court struck down the statute as an unconstitutional confiscatory taking, rejecting an argument by the Commissioner of Insurance that the insurers were only entitled to a determination of the adequacy of rates based on the overall automobile insurance situation, and not product line by product line. *Id.* at 702-04. The court concluded the Legislature's intent was to treat each automobile insurance line separate from one another for rate purposes. *Id.* at 703.

Relying on *Aetna Casualty*, Anthem avers that the Commissioner is similarly precluded from considering any other type of insurance in an adequacy determination. The court disagrees. Beyond this single statutory provision cited in its brief, Anthem points to no other provision within Maine's Insurance Code to support its position. This stands in stark contrast to the situation in *Aetna Casualty* where each type of insurance coverage was subject to separate approval by the Massachusetts Commissioner of Insurance and a legislative intent was easily

19

divined. The Maine Insurance Code, as it relates to health insurance products, implies no such distinct intent from the Legislature, as evidence by the thin statutory support Anthem garners for its position. Simply, the court disagrees that the statutory scheme prohibits the Superintendent from considering the overall financial health of an insurer within its ratesetting methodology.[14] In fact, such a conclusion runs opposite to the court's interpretation of "inadequate" in section 2736, i.e., that the section is meant to protect insureds from an insolvent insurance company that is unable to meet its obligations. In order to determine the adequacy of proposed rates, the Superintendent *must* consider the overall health of the company to determine whether the rates can be sustained.[15] In short, the court does not conclude that the Maine Insurance Code prohibits the Superintendent from considering an insurer's overall financial health, from regulated lines or otherwise.

b.  Ratemaking Principles

Anthem also contends that the Commissioner's interpretation of section 2736 is impermissible cross-subsidization, in violation of ratemaking principles. (Pet.'s Br. 18-21.) Anthem relies on *Maine Water Co. v. Public Utilities Commission*, 482, A.2d 443 (Me. 1984), in which the Law Court vacated a decision of the Public Utilities Commission (PUC) that refused to increase water rates for one of the company's water divisions, instead shifting the burdens onto the customers of the four other water divisions. In that case, Maine Water was the consolidation of separate water companies, providing water through separate and geographically independent water systems that served its each distinct set of customers. *Id.* at 446. One

---

[14] At oral argument, Anthem's counsel acknowledged that solvency has a role in the ratesetting analysis, but argued that it is not the beginning and the end of the analysis.

[15] For example, if an insurer not presently involved in the individual insurance market wished to compete with Anthem, it might very well offer lower rates in order to attract customers and choose to subsidize any initial losses with its other lines. As long as there was no risk of insolvency of the company, section 2736 would not prohibit such a rate proposal.

20

division had both a small number of customers and poor water quality, and the cost of service of providing water to that division was more than the revenue produced by existing rates. *Id.* at 455. Nevertheless, the PUC denied the requested rate increases because it determined the "worth" of the water was not as much as customers would need to be charged, and allowed Maine Water to recover the revenue from the other four divisions. *Id.* The Law Court vacated the PUC's order, holding that the decision violated "the fundamental objective in utility ratemaking . . . that customers who benefit from a service should bear the costs of providing that service." *Id.* at 455-56 (quotation marks omitted). The PUC decision constituted "cross-subsidization," that is, protecting one class of customers by attributing their costs to another class that must pay the first class's costs. *See id.* at 456; *accord El Paso Elec. Co. v. FERC*, 667 F.2d 462, 468 (5th Cir. 1982). Anthem asserts that the Superintendent has done the same in the present case, forcing them to "look elsewhere for the fair return from the Individual Insurance Products to which it is entitled." (Pet.'s Br. 20.)

The court agrees that "one class of customers should neither be burdened by the losses from other service nor benefited from its profits." *Me. Water Co.*, 482 A.2d at 456. The court does not agree, however, that cross-subsidization is in fact occurring in this case. First, Anthem's argument is premised upon the individual rates being inadequate in the first place, i.e. not providing a fair and reasonable rate of return. The present case lies in stark contrast to the circumstances in *Maine Water Co.*: whereas there, the existing water rates would not cover the company's costs of providing the water, there is no suggestion that the current rate or the proposed rate will force Anthem to operate at a loss or not be able to cover its costs. In fact, as the Superintendent found, Anthem's individual product lines have generated an historical profit, thus not burdening any of their other existing products lines through impermissible

21

cross-subsidization at all. Second, in *Maine Water Co.*, the PUC allowed Maine Water to recover the resulting loss of revenue from the other divisions, thus charging those divisions costs of service from which they derived no benefit. There has been no indication of a similar situation in this proceeding. The Superintendent's consideration of Anthem's overall financial health is a far cry from instructing Anthem to recover costs from its other product lines. Under the present circumstances, the court does not conclude that the Superintendent's consideration of Anthem's overall financial health to be cross-subsidization.[16]

### 3. Unconstitutional Taking

Finally, Anthem contends that as a result of the Superintendent's interpretation and application of Section 2736 in this case, the rate set by the Superintendent violates the Takings Clauses of the Fifth and Fourteenth Amendments to the United States Constitution and Sections 6-A and 19 of Article 1 of the Maine Constitution.[17] *See* 5 M.R.S. § 11007(4)(C)(1) (explaining that, on judicial review, a court may reverse an administrative decision if it is "[i]n violation of constitutional or statutory provisions"). Anthem contends that the rates set by the Superintendent are confiscatory because they do not provide a reasonable rate of return for Anthem. (Pet.'s Br. 10-14; Pet.'s Reply Br. 4-6.)

At oral argument, both parties focused on the United States Supreme Court's decision in *Duquesne Light Co. v. Barasch*, 488 U.S. 299 (1989), related to utility ratemaking, as the

---

[16] Because the court concludes there was no cross-subsidization in this case, the court does not address Anthem's constitutional argument regarding cross-subsidization. *See Town of Burlington v. Hosp. Admin. Dist. No. 1*, 2001 ME 59, ¶ 19, 769 A.2d 857, 864 (stating a court should endeavor to resolve controversies before it "without deciding constitutional issues, reaching such an issue only if it is entirely necessary to a decision on the cause in which it is raised" (quotation marks omitted)).

[17] The parties do not draw any distinction between the requirements of the federal and state constitutions, and most of their arguments draw on federal constitutional requirements. *See Bell v. Town of Wells*, 557 A.2d 168, 177 (Me. 1989) (indicating the state and federal takings clause are coextensive); *Seven Islands Land Co. v. Maine Land Use Regulation Comm'n*, 450 A.2d 475, 482 (Me. 1982) (analyzing a takings claim without drawing any distinction between the state and federal constitutions). The court will thus do the same, and analyze the case under the federal standard.

22

appropriate framework for the court to evaluate Anthem's constitutional challenge. In *Duquesne*, five Pennsylvania electricity utilities joined together to plan the construction of seven nuclear power plants to build more generating capacity. *Id.* at 302. Thirteen years later, in 1980, the utilities abandoned the project because the outlook on nuclear power had changed after the accident at Three Mile Island. *Id.* The planned plants were neither built nor used. *Id.* Two of the utilities sought to recoup their capital expenditures through amortized rate increases over a ten-year period. *Id.* at 302, 305. Meanwhile, the Pennsylvania Legislature enacted a new law which prohibited "the cost of construction or expansion of a facility undertaken by a public utility producing . . . electricity" to be included in the rate base for that utility unless "the facility is used and useful in service to the public." *Id.* at 304 (quoting 66 PA. CONS. STAT. § 1315 (Supp. 1988)). The rate increases were approved at the administrative level,[18] but rejected by the Pennsylvania Supreme Court. *Id.* at 304-05. The Pennsylvania Supreme Court rejected the utilities' constitutional challenge, holding that "[t]he just compensation safeguarded to a utility by the fourteenth amendment of the federal constitution is a reasonable return on the fair value of its property at the time it is being used for public service." *Id.* at 305 (quotation marks omitted).

On appeal, the United States Supreme Court affirmed that holding. *Id.* at 316. The Court explained: "The guiding principle has been that the Constitution protects utilities from being limited to a charge for their property serving the public which is so 'unjust' as to be confiscatory." *Id.* at 307. The Court also reaffirmed that in ratemaking,

> "[i]t is not theory but the impact of the rate order which counts. If the total effect
> of the rate order cannot be said to be unreasonable, judicial inquiry . . . is at an
> end. The fact that the method employed to reach that result may contain
> infirmities is not then important." . . . [W]hether a particular rate is "unjust" or
> "unreasonable" will depend to some extent on what is a fair and reasonable rate of

---

[18] The Pennsylvania Public Utilities Commission interpreted the statute to only "exclude[d] the costs of canceled plants (obviously not used or useful) from the rate base, but not as preventing their recovery through amortization." *Duquesne Light Co. v. Barasch*, 488 U.S. 299, 304 (1989).

23

return given the risks under a particular ratesetting system, and on the amount of capital upon which the investors are entitled to earn that return.

*Id.* at 310 (quoting *FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 602 (1944)). *Duquesne* makes clear that the constitutionality of ratemaking is not analyzed in a piecemeal fashion:

> The economic judgments required in rate proceedings are often hopelessly complex and do not admit of a single correct result. The Constitution is not designed to arbitrate these economic niceties. Errors to the detriment of one party may well be canceled out by countervailing errors or allowances in another part of the rate proceeding. The Constitution protects the utility from the net effect of the rate order on its property. Inconsistencies in one aspect of the methodology have no constitutional effect on the utility's property if they are compensated by countervailing factors in some other aspect.
>
> Admittedly, the impact of certain rates can only be evaluated in the context of the system under which they are imposed. One of the elements always relevant to setting the rate under *Hope* is the return investors expect given the risk of the enterprise. *Id.*, at 603 ("[R]eturn to the equity owner should be commensurate with returns on investments in other enterprises having corresponding risks"); *Bluefield Water Works & Improvement Co. v. Public Service Comm'n of West Virginia*, 262 U.S. 679, 692-693 (1923) ("A public utility is entitled to such rates as will permit it to earn a return . . . equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties").

*Id.* at 314-15.

Although ratemaking confiscation arguments typically involve public utilities, the Law Court has indicated that the concept also applies to ratemaking in the insurance context: "[T]o establish an unconstitutional confiscation, an [insurer] must prove that its [investors] are without the opportunity to realize a reasonable return on their investment in Maine and that the inadequate return results directly from the rate approval process and not from other causes." *Nat'l Council on Comp. Ins. v. Superintendent of Ins.*, 481 A.2d 775, 781 (Me. 1984) (analyzing the constitutionality of ratemaking in the workers' compensation insurance market). There are, to be sure, significant differences between utility ratemaking and insurance ratemaking. First,

24

insurance does not involve the same amount of physical infrastructure as utilities. For example, water and power utilities expend capital to build and maintain physical systems to deliver services to consumers. Anthem has no similar physical infrastructure to maintain. Second, and relatedly, public utilities, unlike insurance companies are monopolies providing essential services to consumers. The court does not mean to suggest that health insurance in today's culture is not just as essential, only that it is not a monopoly like public utilities.[19] Nevertheless, given the Law Court's pronouncement in *National Council on Compensation Insurance*, setting insurance rates is at least analogous to public utility ratemaking and the court will utilize that framework.

First the court must address the scope of its inquiry. To the extent that Anthem extends its statutory arguments into its constitutional arguments, the court must make clear that it is examining the actual rate set by the Superintendent and not merely one aspect of the ratemaking process. *Duquesne* makes clear that it is the *impact* of the rate that must pass constitutional muster, not each individual component within the ratemaking methodology. 488 U.S. at 310, 314. *Duquesne* sets up a framework whereby the court must review the impact of the actual rate set, and ensure that within the methodology utilized by the ratemaker there has been some consideration of the return investors expect to make based on risks in the ratemaking system and the "returns on investments in other enterprises having corresponding risks." *See id.* at 310, 314-15 (quotation marks omitted). Accordingly, based on the evidence presented to the Superintendent, the court must determine whether Anthem has shown that the rate set by the Superintendent unconstitutionally deprives Anthem's investors of an "opportunity to realize a

---

[19] Although Anthem may be the only insurer within the state to currently be offering individual health insurance products, the court will not interpret a statute based on the number of insurers in the market.

25

reasonable return on their investment in Maine" and that deprivation "results directly from the rate approval process and not from other causes." *Nat'l Council on Comp. Ins.*, 481 A.2d at 781.

Anthem presented evidence to the Superintendent that the average built-in margin for risk and profit is between 3% and 5% of health insurance premiums. (R. 778.) Anthem also presented evidence on the risks for Anthem, including operating in a guarantee issue environment and demographics showing that the Maine population is older and less healthy than the national average. (R. 724-28, 730.) Anthem did not argue or present any evidence to the Superintendent that setting a rate that does not include a margin for risk and profit less than 3% would threaten the financial integrity of its individual products line or its overall business. Based on the record, the court concludes that Anthem has not shown that the overall rate set by the Superintendent is confiscatory, depriving Anthem of achieving a reasonable rate of return.[20] *See Duquesne*, 488 U.S. at 312 (noting that the utilities had not argued or demonstrated the set rates "jeopardized the financial integrity of the companies" or were "inadequate to compensate current equity holders for the risk associated with their investments"). The profit margin is not the *sine qua non* in the constitutional analysis. It is one factor to be considered among many. The court cannot say that the overall rate set by the Superintendent does not provide Anthem with a reasonable rate of return.

C.    Conclusion

The court concludes that the statutory "not . . . inadequate" standard is for the protection of policyholders. Utilizing this standard, the rate set by the Superintendent is within the range of rates that are both "not . . . inadequate" and "not . . . excessive" and meets the mandates of

---

[20] Anthem in fact projected that the built-in 3% profit margin for the second half of 2011, in conjunction with the 0.5% built-in profit margin for the first half of 2011, would produce a projected pre-tax profit of 6.4% for calendar year 2011. (R. 231, 409 n. 12.)

26

section 2736. The Superintendent's decision is not impermissible cross-subsidization. Finally, the court concludes that the rate set by the Superintendent satisfies the constitutional requirements and does not constitute a regulatory confiscation.

III.    MOTION FOR SUMMARY JUDGMENT

The motion of Anthem for summary judgment on the independent claims in Counts II and III of the Petition is pending before the court. On July 20, 2011, the court granted the joint motion of the Superintendent and the Attorney General to stay further briefing or enlarge the time to respond to that motion for summary judgment. The court ordered the stay after weighing the parties' competing interests in expediency and economy, and concluding that briefing on the motion for summary judgment was premature until after decisions are rendered on the 80C appeal and the motions to dismiss.

The court has now decided the administrative appeal and has granted the motions to dismiss. Accordingly, the motion for summary judgment is moot and, therefore, should be dismissed along with Counts II and III without hearing or further argument.

IV.    DECISION

Based on the foregoing, and pursuant to M.R. Civ. P. Rule 79(a), the Clerk is directed to enter this Order on the Civil Docket by a notation incorporating it by reference, and the entry is:

A.    The motions of the Superintendent, the Attorney General, and Consumers to dismiss Petitioner's independent claims in Counts II and III of the Petition are GRANTED.

B.    As to Count I of the Petition, which by agreement of the parties incorporates and includes the constitutional claims in Count II of the Petition, the Decision and Order of the Superintendent of Insurance, dated May 18, 2011, which subsumes and incorporates the Superintendent's Decision and Order, dated May 12, 2011, is AFFIRMED.

27

C.  Petitioner's Motion for Summary Judgment on Petitioner's independent claims in Counts II and III of the Petition is DISMISSED, without hearing or further argument, for the reason that it has been rendered moot by the foregoing decisions.

Date:   August 29, 2011

_____
Chief Justice, Superior Court

28